United States District Court
Southern District of Texas
**ENTERED**
December 08, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAC SURGICAL PARTNERS P.A., | § | |
| WELLNESS SURGICAL ASSOCIATES, P.A., | § | |
| PROFESSIONAL FOOT and ANKLE | § | |
| SURGICAL CENTER, P.A., | § | |
| SSPA SURGICAL CENTER, P.A., | § | |
| LAKE BREEZE SURGICAL AFFILIATES, | § | |
| P.A., | § | |
| SURGERY PRO, P.A., | § | |
| MAISLOS PODIATRY, P.A., | § | |
| HOPESTAR FOOT & ANKLE SURGERY | § | |
| CENTER, P.A., | § | |
| LIBERTY FOOT & ANKLE SURGERY | § | CIVIL ACTION NO. 4:11-CV-1355 |
| CENTER, P.A. | § | |
| CADENZA SPECIALTY CARE, P.A., | § | |
| GOOD FEET SURGERY, P.A., | § | |
| PREMIER SURGICAL GROUP, P.A., | § | |
| FSS-HOUSTON FOOT, P.A. | § | |
| MANZANO SURGICAL AFFILIATES, P.A. | § | |
| MMN ENTERPRISE SURGERY CENTER, | § | |
| P.A. | § | |
| SPRINT FOOT & ANKLE SURGERY | § | |
| CENTER, P.A., | § | |
| FAIRWAY SURGICAL LCENTER, P.A. | § | |
| SJS SURGERY, P.A. | § | |
| ASPEN SURGICAL CENTER, P.A. | § | |
| REDBIRD FOOT & ANKLE SURGERY | § | |
| CENTER, P.A. | § | |
| KLA FOOT & ANKLE SURGICAL CENTER, | § | |
| P.A. | § | |
| ALEX SURGICAL CENTER, P.A. | § | |
| ELITE SURGICAL CENTER, P.A. | § | |
| LONESTAR SURGERY CENTER, P.A. | § | |
| LYNN SURGICAL AFFILIATES, P.A. | § | |
| LSO SURGERY CENTER, P.A., | § | |
| SOUTH SIDE ENT, P.A. | § | |
| AMS SURGICAL CENTER, P.A. | § | |
| GALLERIA SURGICAL ASSOCIATES, P.A. | § | |
| CC HOUSTON SURGICAL CENTER, P.A. | § | |
| ANKLE AND FOOT SURG EXCEL, P.A. | § | |
| STARBOARD SPECIALTY CARE, L.L.P. | § | |
| JMB SURGICAL AFFILIATES, P.A. | § | |
| RDJ SURGICAL CENTER, P.A. | § | |

IRISH SURGICAL CENTER, P.A.                        §
GATOR SURGICAL, P.A.                               §
COMPREHENSIVE SURGICARE CENTER,                    §
LLC,                                               §
                                                   §
        Plaintiffs,                                §
                                                   §
                                                   §
VS.                                                §
                                                   §
                                                   §
                                                   §
UNITED HEALTHCARE SERVICES, INC.                   §
and INGENIX, INC.                                  §
                                                   §
        Defendants and Counter-Plaintiffs,         §
                                                   §
VS.                                                §
                                                   §
DAC SURGICAL PARTNERS, P.A.,                        §
CONG THU NGUYEN, M.D.,                              §
FAIRWAY SURGICAL CENTER, P.A.,                      §
KEVIN R. SMITH, M.D.,                               §
LAKE BREEEZE SURGICAL AFFILIATES,                   §
P.A.,                                              §
ROY S. LEWIS, M.D.,                                §
LONESTAR SURGICAL CENTER, P.A.,                     §
BECKY MCGRAW-WALL, M.D.,                            §
LYNN SURGICAL AFFILIATES, P.A.,                     §
LARRY P. CONRAD, M.D.,                              §
MANZANO SURGICAL AFFILIATES, P.A.,                  §
MARK A. NICHOLS, M.D.,                              §
SOUTH SIDE ENT, P.A.,                              §
ALFREDO JIMENEZ, M.D.,                             §
SURGERY PRO, P.A.,                                 §
JAMES H. LIU, M.D.,                               §
ANKLE AND FOOT SURG EXCEL, P.A.,                   §
JERRY MILES, D.P.M.                                §
CC HOUSTON SURGICAL CENTER, P.A.,                  §
CHAD C. CLAUSE, D.P.M.,                            §
ELITE SURGICAL CENTER, P.A.                        §
BRYAN YUEH LEE, D.P.M.,                            §
FSS-HOUSTON FOOT, P.A.,                            §
SHERMAN NAGLER, D.P.M.,                            §
GATOR SURGICAL, P.A.,                              §
MARCO VARGAS, D.P.M.,                              §

GOOD FEET SURGERY, P.A.,                      §
ROBERT J. MOORE, III, D.P.M.,                 §
HOPESTAR FOOT & ANKLE SURGERY                 §
CENTER, P.A.,                                 §
GREGORY L. MANGUM, D.P.M.,                     §
KLA FOOT & ANKLE SURGICAL CENTER,             §
P.A.,                                         §
STEPHEN G. EICHELSDORFER, D.P.M.,             §
MAISLOS PODIATRY, P.A.,                        §
GABRIEL MAISLOS, D.P.M.,                       §
MMN ENTERPRISE SURGERY CENTER,                §
P.A.,                                         §
MEYNARD M. NUSSBAUM, D.P.M.                    §
PREMIER SURGICAL GROUP, P.A.,                  §
MARK H. MOSS, D.P.M.,                          §
PROFESSIONAL FOOT & ANKLE                      §
SURGICAL CENTER, P.A.,                         §
DAVID S. JENSON, D.P.M.,                       §
RDJ SURGICAL CENTER, P.A.,                     §
D. SEAN SWEENEY, D.P.M.,                       §
REDBIRD FOOT & ANKLE SURGERY                   §
CENTER, P.A.,                                 §
BRIAN W. ZALE, D.P.M.,                         §
SPRINT FOOT & ANKLE SURERY                     §
CENTER, P.A.,                                 §
JEFFREY J. PENSO, D.P.M.,                      §
SSPA SURGICAL CENTER, P.A.,                    §
ELIZABETH A. KROBORTH-LYON, D.P.M.,           §
WELLNESS SURGICAL ASSOCIATS, P.A.,            §
MARKUS GIACOMUZZI, D.P.M.,                     §
ASPEN SURGICAL CENTER, P.A.,                   §
STEVEN D. THOMPSON, M.D.,                      §
IRISH SURGICAL CENTER, P.A.,                   §
MICHAEL C. MAIER, M.D.                         §
JMB SURGICAL AFFILIATES, P.A.,                 §
SJS SURGERY, P.A.,                            §
EUGENE LOU, M.D.,                             §
LIBERTY FOOT & ANKLE SURGERY                   §
CENTER, P.A.,                                 §
BRUCE MILLER, M.D.,                           §
LSO SURGERY CENTER, P.A.,                      §
KENNETH G. BERLINER, M.D.,                     §
ALEX SURGICAL CENTER, P.A.,                    §
RICHARD GARZA, M.D.,                           §
GALLERIA SURGICAL ASSOCIATES, P.A.,           §
RAFAEL A. LUGO, M.D.,                          §

AMS SURGICAL CENTER, P.A.,                §
AHMED KHALIFA, M.D.,                      §
COMPREHENSIVE SURGICARE CENTER,           §
LLC,                                      §
RICHARD M. WESTMARK, M.D.,                §
CADENZA SPECIALTY CARE, P.A.,             §
STARBOARD SPECIALTY CARE, LLP,            §
ROBERT A. MOORE, JR., M.D.,               §
EUSTON ASSOCIATES, PLLC,                  §
PAR SURGICAL PLLC,                        §
SCOTT A. COHEN, M.D.,                     §
                                          §
        Counter-Defendants                §


## OPINION AND ORDER

On April 8, 2011 Plaintiffs

DAC Surgical Partners, P.A.,

Wellness Surgical Associates, P.A.;

Professional Foot and Ankle Surgical Center, P.A.;

SSPA Surgical Center, P.A.;

Lake Breeze Surgical Affiliates, P.A.;

Surgery Pro, P.A.;

Maislos Podiatry, P.A.;

Hopestar Foot & Ankle Surgery Center, P.A.;

Liberty Foot & Ankle Surgery Center, P.A.;

Cadenza Speciality Care, P.A.;

Good Feet Surgery, P.A.;

Premier Surgical Group, P.A.;

FSS-Houston Foot, P.A.;

Manzano Surgical Affiliates, P.A.;

MMN Enterprise Surgery Center, P.A.;

Sprint Foot & Ankle Surgery Center, P.A.;

Fairway Surgical Center, P.A.;

SJS Surgery, P.A.;

Aspen Surgical Center, P.A. and

Redbird Foot & Ankle Surgery Center, P.A. (referred to collectively herein as "DAC," or "the DACs," or "the DAC plaintiffs")[1] filed suit against United Healthcare Services, Inc., and Ingenix, Inc. (hereinafter referred to as "United").  Doc. 1

On September 14, 2011 the DAC plaintiffs filed a First Amended Complaint (Doc. 46) to add plaintiffs

KLA Foot & Ankle Surgical Center, P.A.;

Alex Surgical Center, P.A.;

Elite Surgical Center, P.A.;

Lonestar Surgery Center, P.A.;

Lynn Surgical Affiliates, P.A.;

Kenneth G. Berliner, M.S., P.A., d/b/a/ Lonestar Orthopedics;[2]

Clear Lake ENT, P.A.;

Ams Surgical Center, P.A.;

Galleria Surgical Associates, P.A.;

CC Houston Surgical Centr, P.A.;

---

[1] Plaintiffs refer to themselves as the "professional entities."  Defendants refer to them as "shell companies"

[2] A misnomer for LSO Surgery Center, PA, corrected in the Third Amended Complaint (Doc. 140).

Ankle and Foot Surg Excel, P.A.;

Starboard Speciality Care, LLP;

JMB Surgical Affiliates, P.A.;

RDJ Surgical Center, P.A.;

Irish Surgical Center, P.A. and

Gator Surgical, P.A. (also referred to collectively herein as "DAC," or "the DACs," or "the DAC plaintiffs")

A second amended complaint was also filed September 14, 2011, (Doc 47). A third amended complaint (Doc. 69) was filed February 29, 2012, adding Plaintiff Comprehensive Surgicare Center, L.L.C.

The judge to whom the case was originally assigned, the Honorable Nancy F. Atlas, recused herself on March 27, 2012, and the case was reassigned to the undersigned.

DAC filed a fourth amended complaint (Doc. 140) on July 2, 2012. In this pleading South Side ENT P.A. was substituted in place of Clear Lake ENT. This fourth amended complaint is the "live" pleading in this case.

Also on July 2, 2012, defendants United Healthcare Services, Inc., and Ingenix, Inc. filed a counterclaim against each of the named DAC plaintiffs and the medical doctors United alleged to be the "owners" of the DAC plaintiffs:

DAC Surgical Partner, P.A. and Cong Thu Nguyen, M.D.;

Fairway Surgical Center, P.A., and Kevin R. Smith, M.D.;

Lake Breeze Surgical Affiliates, P.A., and Roy S. Lewis, M.D.;

Lonestar Surgical Center, P.A. and Becky McGraw-Wall, M.D.;

Lynn Surgical Affiliates, P.A. and Larry P. Conrad, M.D.;

Manzano Surgical Affiliates, P.A. and Mark A. Nichols, M.D.;

South Side Ent, P.A. and Alfredo Jimenez, M.D.;

Surgery Pro, P.A. and James H. Liu, M.D.;

Ankle and Foot Surg Excel, P.A. and Jerry Miles, D.P.M.;

CC Houston Surgical Center, P.A. and Chad C. Clause, D.P.M.;

Elite Surgical Center, P.A. and Chad C. Clause, D.P.M.;

Elite Surgical Center, P.A. and Bryan Yueh Lee, D.P.M.;

FSS-Houston Foot, P.A. and Sherman Nagler, D.P.M.;

Gator Surgical, P.A. and Marco Vargas, D.P.M.;

Good Feet Surgery, P.A. and Robert J. Moore, III, D.P.M.;

Hopestar Foot & Ankle Surgery Center, P.A. and Gregory L. Mangum, D.P.M.;

KLA Foot & Ankle Surgical Center, P.A. and Stephen G. Eichelsdorfer, D.P.M.;

Maislos Podiatry, P.A. and Gabriel Maislos, D.P.M.;

MMN Enterprise Surgery Center, P.A., Meynard M. Nussbaum, D.P.M.;

Premier Surgical Group, P.A., and Mark H. Moss, D.P.M.;

Professional Foot & Ankle Surgical Center, P.A. and David S. Jenson, D.P.M.'

RDJ Surgical Center P.A. and D. Sean Sweeney, D.P.M.;

Redbird Foot & Ankle Surgery Center, P.A. and Brian W. Zale, D.P.M.;

Sprint Foot & Ankle Surgery Center, P.A., and Jeffrey J. Penso, D.P.M.;

SSPA Surgical Center, P.A. and Elizabeth A. Kroborth-Lyon, D.P.M.;

Wellness Surgical Associates, P.A. and Markus Giacomuzzi, D.P.M.;

Aspen Surgical Center, P.A. and Steven D. Thompson, M.D.;

Irish Surgical Center, P.A. and Michael C. Maier, M.D.;

JMB Surgical Affiliates, P.A., SJS Surgery, P.A. and Eugene Lou, M.D.;

Liberty Foot & Ankle Surgery Center, P.A. and Bruce Miller, M.D.;

LSO Surgery Center, P.A. and Kenneth G. Berliner, M.D.;

Alex Surgical Center, P.A. and Richard Garza, M.D.;

Galleria Surgical Associates, P.A. and Rafael A. Lugo, M.D.;

AMS Surgical Center, P.A. andAhmed Khalifa, M.D.;

Comprehensive Surgicare Center, LLC and Richard M. Westmark, M.D.;

Cadenza Specialty Care, P.A., Starboard Specialty Car, LLP and Robert A. Moore, Jr., M.D. Doc. 141.   The doctor counter-defendants are hereinafter collectively referred to as the "Doctors."

DAC's fourth amended complaint, contains the same 37 plaintiff companies as United's counter-defendant companies.

On January 25, 2013 United removed a case filed on December 17, 2012 in the 113th Judicial District Court of Harris County Texas, styled *Par Surgical, PLLC and Euston Associates, PLLC v. United Healthcare Services, Inc. and Ingenix, Inc.*, Civil Action No. 2012-73871.  The removed case, 4:13-cv-00197, was assigned to the Honorable Ewing Werlein.  On April 8, 2013 United filed an opposed motion to consolidate the *Par/Euston* case with the instant case; the motion to consolidate was granted June 24, 2013.

Thereafter, on July 5, 2013, United filed a first amended counterclaim (Doc. 316), which added Euston Associates, PLLC, Par Surgical PLLC, and Scott A. Cohen, M.D. as counter defendants (hereinafter sometimes referred to collectively as "Par").

Pending before the Court are:

1. United's Consolidated Motion for Summary Judgment as to All of Plaintiffs' Causes of

Action (Doc. 485);

2.  Par's, Euston's, and   Dr. Cohen's Motion for Summary Judgment on United's Counterclaims (Doc. 491);

3.  The Doctors' Motion to Dismiss and Motion for Summary Judgment Dismissing United's Counterclaims and Plaintiffs' Motion for Summary Judgment Dismissing Defendants' Affirmative Defenses (Doc. 500);

4.  Dr. Cohen's, Par's and Euston's Motion for Reconsideration of Motion to Dismiss (Doc. 505);

5.  United's Rule 72(a) Objections to Magistrate Judge Stacy's Order Denying United's Motion to Strike Declarations and Advantix Records Attached to Plaintiffs' Response to United's MSJ, in Violation of Court Order (Doc. 532)[3]

**I. Background**

This mare's nest of a case involves two competing claims involving facility fee payments from United Healthcare Services, Inc. to the plaintiff DACs and their doctor owners.  The DAC plaintiffs assert in their Fourth Amended Complaint that United represented in the course of insurance verification telephone calls that it would pay $20 million of "facility fees" for surgical operations performed at The Palladium for Surgery ("Palladium"), an ambulatory surgical center ("ASC") located in Houston, Texas.[4]  Doc. 140

"Most medical claims involving a surgery include two kinds of charges:  a facility fee and a physician fee.  The hospital or ASC is typically paid the facility fee and the doctor is typically paid the physician fee."  Doc. 500 at 2-3.  In the instant case, however, the DAC

---

[3]This motion will be addressed in a separate Opinion and Order.

[4] "Ambulatory surgery centers . . . are health care facilities where surgical procedures not requiring an overnight hospital stay are performed." Doc 500 at 2.

plaintiffs, wholly owned by doctors who performed surgeries at Palladium, contracted with Palladium for the provision of surgical facility services during the surgeries performed.[5] Each of the DAC plaintiffs and Palladium entered into two forms of separate, but essentially identical written agreements, facility use agreements and billing services agreements (referred to hereinafter collectively as "Exclusive Use Agreements," "EU agreements" or "EUs") Doc 489-1 through Doc. 489-7.[6] Pursuant to these agreements, the DAC companies and Palladium agreed that DAC would pay Palladium: (1) 45% of the DACs' net monthly collected revenue to "use" Palladium's space; and (2) 5% of the DACs' net monthly collected revenue for Palladium to provide "billing services" as each of the DAC companies' "sole and exclusive agent," for among other things, submitting facility fee claims to insurers such as United. Doc. 489-1 at ¶¶ 7&8; Doc 489-4 at ¶¶ 1.1 and 4.1. After the facility fees were collected by the DACs from insurers, such as United, the DAC companies paid to Palladium 50% of the collected amount to Palladium (45% for use of the facility plus 5% for billing services) and retained the remaining 50%, which then passed through the DAC companies to their Doctor owners. Kovnat Tr. Doc. 486-30 at 4:25-6:24; R.A. Moore Tr. Doc. 487-12 at 21:14-20.

Under the EU agreements, Palladium served as the DAC companies' agent for all billing and collection matters related to the facility fees. Doc. 489-4. Palladium was given access to the DAC companies' bank accounts, was appointed as their "true and lawful agent and attorney-in-fact," and was granted "special power of attorney and appointment, to deposit in [the DAC

---

[5]  In footnote 2 of Plaintiffs' Fourth Amended Complaint (Doc. 140) Plaintiffs clarify that two DACs, "Comprehensive Surgicare Center, LLC and SJS Surgery, P.A., entered into Ambulatory Surgical Center Use Agreements ('Use Agreements')" with an ASC other than Palladium. Nevertheless, these DACs presumably had agreements with the other ASC that were similar to the DACs who contracted with Palladium, and these ASCs will also be referred to by the collective "Palladium" name.

[6] References to exhibits are cited to the record filed in the Court's electric filing system. For example, the reference to exhibits 68 and 69 to Doc. 506, is Doc. 489-1 through 489-7. References to deposition excerpts use the page numbers of the document, as filed in the system, found in the top line of each filed page, not to the actual page number of the deposition itself. Line numbers remain the same.

companies' bank accounts] all [facility fees] collected" on behalf of the DACs, by Palladium. *Id.* ¶ 3.5.

In January 2009, United refused to pay the facility fees, asserting that the DAC plaintiffs misrepresented facility fees on claims forms submitted to United, representing the DAC plaintiffs as licensed facilities when they were really single-member entities or "shell companies" formed by the counter-defendant Doctors for the sole purpose of submitting fraudulent facility fee claims. United alleges it would have denied the facility fee claims pursuant to coverage limitations in its insurance policies had it known the facility fees were passing through to the Doctors

## II.  Summary Judgment Standard

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the non-movant bears the burden of proof at trial, the movant must offer evidence that undermines the non-movant's claim or point out the absence of evidence supporting essential elements of the non-movant's claim; the movant may, but does not have to, negate the elements of the non-movant's case to prevail on summary judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the non-movant's case on which the non-movant bears the burden of proof at trial, the non-movant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The non-movant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the non-movant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*,

174 F.3d 636, 644 (5 th Cir. 1999), *citing Celotex*, 477 U.S.  at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence.  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence—not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).  The non-movant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial."  *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

"A party cannot defeat a motion for summary judgment with an affidavit that contradicts, without explanation, his sworn testimony."  *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *see also Thurman v. Sears Roebuck & Co.*, 952 F.2d 128, 137 n. 23 (5th Cir. 1992)("[N]onmovant cannot defeat summary judgment by submitting an affidavit which contradicts, without explanation, the nonmovant's previous testimony in an attempt to manufacture a disputed material fact issue.").

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

The Court may not make credibility determinations. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009), *citing Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th

Cir. 2007).

The Court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).   Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

While a failure to state a claim is usually challenged by a motion for dismissal under Rule 12(b)(6), it may also constitute the basis for a summary judgment under Rule 56 because "the failure to state a claim is the 'functional equivalent' of the failure to raise a genuine issue of material fact." *Walen v. Carter*, 954 F.2d 1087, 1098 (5th Cir. 1992).   In such circumstances the motion for summary judgment challenging the sufficiency of the complaint will be "evaluated much the same as a 12(b)(6) motion to dismiss." *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993).   A motion for summary judgment should be granted if, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff, the plaintiff's complaint nonetheless fails to state a claim. *Id.*

"'On cross-motions for summary judgment [the court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" *Amerisure Ins. Co v. Navigators Ins. Co.*, 611 F.3d 2o99, 304 (5th Cir. 2010), *quoting Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## III. Discussion

## A. United's Motion for Summary Judgment (Doc. 485)

In its 108 page Motion for Summary Judgment (Doc.485) United attacks the allegations of DAC's  Fourth Amended Complaint on all counts and from many angles: (1) lack of standing;

(2) lack of a real party in interest under Rule 17; (3) statute of limitations; (4) ERISA preemption; and (5) summary judgment on the merits of each of plaintiffs' claims, including those United maintains were not submitted to United by the DACs.   Doc. 485.

Putting aside for the moment the arguments for lack of standing, lack of real party in interest under Rule 17, statute of limitations issues, ERISA preemption issues, and claims not submitted, the overriding subjects of the motion on the merits fall into two categories.  First, United maintains that the DACs, the professional entities, or, as United refers to them, "the shell companies," were not licensed surgical facilities under the law, but vehicles used to pass through to the Doctor owners of the DACs kickback payments to the Doctors for scheduling procedures at Palladium.  Palladium, the actual licensed ambulatory surgical facility, instead of claiming facility fees from United, the insurer, contracted with each of the DACs, which were wholly owned by each corresponding Doctor owner, to act as DAC's agent for billing and receiving facility fees from the insurer, which fees would be deposited by the agent, Palladium, into the bank accounts of the DACs.  The DACs, again through their agent Palladium, would then pay to Palladium, 45% of the fees received from United as payment for the facilities Palladium provided and 5% as payment for its services as billing and collection agent.  The remaining 50% of the insurance payments were retained by the DACS and passed through to the Doctor owners. The DACs, each wholly owned by a Doctor, and most calling themselves a name suggestive of a surgical facility, actually had no license, owned and ran no facility, and incurred only the minimal expenses necessary to continue as viable corporations.  *Cf* Doc. 490-7 through 490-21. The DACs do not dispute any of these material facts.

United's argument is that because the DACs had no licenses, but relied entirely on Palladium's license, the DACs were not owed a facility fee because they could not legally collect

a facility fee and thus had no out-of-pocket expenses.  DAC argues that for the 50% fee the DACs retained to pass on to their owner Doctors, they "procured" from Palladium the facilities for the Doctors' procedures.  Doc. 500 at 4-5. Putting aside the question whether such a scheme is even legal, the fact remains that the DACs were not procuring anything; they had nothing to do, but serve as a conduit for payments from United to the Doctor owners.

Second, United maintains there were no oral implied contracts, as alleged by the DACs, formed between the DACs and United for payment of the facility fees.  United further argues that the negligent misrepresentations the DACs allege United made, were not, in fact, made.

The DACs' arguments for implied contract and for negligent misrepresentation rely on the same factual footing.  When Palladium, acting as the billing agent of the DAC, made verification telephone calls to United, requesting confirmation of coverage of a patient, the DACs argue that United told them that the patient was covered for the procedure indicated and guaranteed payment to the DAC for the facility fees before the procedure was done.  Although there is no dispute that verification telephone calls were made by Palladium, as billing agent for the DACs, to United, there is almost no evidence in the summary judgment record of the content of those conversations.   Plaintiffs allege United represented during verification calls that procedures performed at Palladium were "valid, billable and payable," while knowing that United would not pay for them. Doc. 510 at 37. In support of this allegation, plaintiffs offer the testimony of Beverly Randall-Tillis, Palladium's Business Office Manager. She testified that she called United "to verify whether or not the benefits were effective." Doc. 512-25 at 5:22-25.

> Q. Did you actually make phone calls to United to verify payment—to verify coverage?
> A. Yes.
> Q. And in those phone calls, what were the topics that you had discussed?
> A. The topics when you call to verify the insurance is the

patient's name, the patient's ID Number and their date of birth, and the CPT code.

Doc. 512-25, at 12:18-13:2

Q. For instance, if you told them that you had a particular CPT code, the patient's name, ID Number, date of birth, United never communicated to you that they--it would only be covered if it was to take place in a licensed ASC facility?
A. No.

*Id*. at 11:22-16.

Q. Did United ever tell Palladium that it would only pay facility fees to a licensed ASC?
No.

*Id*. at 11:10-12.

Plaintiffs do not provide any other relevant testimony as to the content of the verification calls. The only witness who actually participated in these verification calls, Beverly Randall-Tillis, testified that in verification telephone calls she had with United she did not recall if United "ever promis[ed] or guarantee[d] payment before a patient had his or her procedure," and that she understood "that there's a difference between a carrier verifying insurance benefits as opposed to guaranteeing payment." Randall-Tillis Tr., Doc. 512-25 and 487-19 at 5:17-6:3. The case is replete with exhibits showing there were telephone calls, but no evidence to establish that United contracted with the DACs to pay for facility fees or negligently misrepresented that it would pay for those fees.

### (1) Implied Contract and Breach of Contract Claims

The elements of a breach of contract claim are the same, whether the alleged contract is express or implied. *Cf. Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, review denied). The elements of breach are: (1) existence of a contract, (2) performance or tender of performance by the plaintiff, (3) breach by the defendant, and (4) damages resulting from that breach. *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003) (citing *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App. – Houston [14th Dist.] 2000, no pet.)).

The existence of an unwritten implied-in-fact contract may be shown by conduct indicating a mutual intent to be bound, *R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 222 (5th Cir. 2005). Like a written contract, an implied contract "must be sufficiently certain so as to enable the court to determine the respective legal obligations of the parties." *See Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 568-69 (Tex. App.– Dallas 1989) (affirming summary judgment for defendant on breach of implied contract claim). Plaintiffs argue implied contracts were formed by verification calls, use of the Ingenix database[7], and past payments of facility fees. First, Plaintiffs provide no authority that a verification phone call to an insurer satisfies the elements of a contract. They argue, "The verification calls clearly conveyed an intent to enter into a binding agreement with United. Indeed, if the verification calls were not for the purpose of communicating an offer that United could accept, then the calls would have no purpose." Doc. 510 at 45. This argument is specious. The purpose of verification calls is to obtain information whether patients have insurance coverage to pay for a medical   medical treatment before  providing treatment. *See* Doc 486-13 (DACs testifying that verification is not a promise of payment); Doc. 489-38 (disclaimer).

Second, Plaintiffs have shown no connection between the Ingenix database licensed to Palladium and the usual and customary rates provision in the Eligibility Document or any other written or oral representation in regards to fees.

Third, past payments alone do not show mutual intent to be bound, without performance by the other party.  United argues plaintiffs were "shell companies" that did not contribute any facility services or incur any expenses. Doc. 490-5 (reported expenses). Plaintiffs argue they had obligations to Palladium under the use agreements. Doc. 510 at 47 ("responsible for all medical

---

[7] See below for a discussion of the Ingenix database.

and professional matters relating to its use of the ASC, including, without limitation, compliance with the medical staff bylaws, and the rules and regulations of the ASC"; "best efforts to assure that the operations in the ASC meet a high degree of quality of health care consistent with the standards within the community in which the ASC is situated."). These provisions do not specify acts that plaintiffs must perform, aside from giving advice. The DACs have failed to bring forward any evidence of a genuine issue of material fact to establish the existence of an implied contract with United.  United's Motion for Summary Judgment as to the Plaintiffs' claims of Breach of Contract and an Implied Contract will be granted.

## (2) Negligent Misrepresentation

"Negligent misrepresentation requires proof that: (1) the defendant in the course of his business or a transaction in which he had an interest; (2) supplied false information for the guidance of others; (3) without exercising reasonable care or competence in communicating the information; (4) the plaintiff justifiably relied on the information; (5) proximately causing the plaintiff's injury." *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 577 (Tex. App. -- Dallas 2007, no pet.); *see also In Re Stonebridge Techs., Inc.*, 430 F.3d 260, 267 n.4 (5th Cir. 2005).

In order to prove a claim of negligent misrepresentation DAC must show that United made representations in the course of its business for the guidance of others, but did not exercise reasonable care or competence in obtaining or communicating the information, and that DAC suffered pecuniary loss by justifiably relying on the representations United made.  *Alexander v. Grand Prarie Ford, L.P.*, 2007 WL, at *6 (N.D. Tex. May 31, 2007).  *CF also Schwartz v. Gregg*, 2010 WL 2977479, at *3-7 (Tex. App. Jul. 28, 2010) and *Fidelity Nat'l Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 631 (E.D. Tex. 2011).  As was discussed above,

the DAC plaintiffs have pointed to no evidence of a genuine issue of material fact that United made any guarantees of payments or representations of coverage to them beyond the health care plans.  As a result there can be no evidence of reliance or damages.

United argues in its Motion for Summary Judgment that DAC has no evidence to support its allegations that United made actionable negligent misrepresentations to their billing agent concerning coverage and payment of fees.   The Fourth Amended Complaint filed by DAC. makes a number of negligent misrepresentation claims against United:

> United Healthcare specifically represented that the patients receiving medical services and treatment were covered under an insurance policy, and that Plaintiffs' claims for facility fees associated with the medical services and treatment, would be paid by United Healthcare.

Doc. 140, ¶ 65

> United represented that the facility fees incurred and submitted by Plaintiffs would be compensated in accordance with the usual and customary rates, provided that such rates did not exceed the maximum pre-allowable facility fee set forth on United Healthcare's fee schedule.

*Id.*

In ¶ 44 of the Fourth Amended Complaint (Doc. 140), DAC alleged that in calls to verify coverage made to United by the doctors' offices, United "explained what it would pay for the claim, i.e. the percentage of the usual and customary amount charged for the planned procedure."

In ¶ 46 of the Fourth Amended Complaint (Doc. 140) DAC alleged that in calls to verify coverage made to United by Palladium as DAC's billing agent, United "confirmed that the surgical procedures were valid and billable and explained what it would pay for the claim."

In ¶ 52 of the Fourth Amended Complaint (Doc. 140)  DAC alleged

> [P]ursuant to Industry custom, Plaintiffs' billing agent and the doctors' office both called United Healthcare before medical services and surgical treatment were provided to United Healthcare's insureds at an ASC.  They would call a number provided by United Healthcare to receive verification and authorization for the surgery.   A representative of United

Healthcare would answer, verify a particular patient's coverage, confirm that the medical services were valid and billable, and provide a preauthorization of the medical services.  United Healthcare also explained what it would pay for the claim, i.e., the percentage of the usual and customary amount charged for the planned procedure.  This encompassed, not only approval of the particular surgery, but also the use of the facility in which that surgery would be performed.

DAC continued in ¶ 53 of the Fourth Amended Complaint (Doc. 140)

In other words, before each procedure was performed, United Healthcare expressly represented—not once, but twice—that Plaintiffs would be compensated by United Healthcare for the fees associated with the use of the ASC. The representations regarding coverage and payment made by United Healthcare were made by an authorized agent or representative of United Healthcare.

In ¶ 57 of the Fourth Amended Complaint (Doc. 140) DAC alleged

United Healthcare represented on multiple occasions that the facility fees associated with the medical services and treatment were covered under the insurance contract between United Healthcare and Plaintiffs' patients.  United Healthcare provided a fee schedule to Plaintiffs' billing agent containing representations regarding the allowable facility fee associated with each covered medical service and treatment performed on United Healthcare's insureds at the ASC.

In ¶ 66 of the Fourth Amended Complaint (Doc. 140) DAC alleged that "United Healthcare never mentioned that the UCR [usual and customary rate] Data was flawed and because of this Plaintiffs would be underpaid," and in ¶ 67, "United Healthcare's false representations were made in response to specific inquiries regarding coverage and payment."

United first points out in its Motion for Summary Judgment (Doc 485) that "[m]ost of the foregoing are not actionable as negligent misrepresentations because they are not allegations of existing fact, but are alleged promises of future payment," citing a Memorandum and Opinion Judge Atlas filed early in this case in which she clarified that "Plaintiffs may not pursue a

negligent misrepresentation claim based on promises of future performance."  Doc. 59 at 6.

In addition, United argues that the DACs have presented no evidence that there were any promises allegedly made that were not kept.  United cites *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Insurance Company,* 2007 WL 320974 (S.D.Tex, Jan. 30, 2007). In that case plaintiff's witness, who placed calls to the defendant insurance company to verify coverage for a patient, testified that she agreed with the statement, "'So at the end of the day Ambulatory Infusion contends that it should be paid these claims because Prudential improperly denied covered charges.'" 2007 WL 320974 *4.  The witness also testified that no "representative of the defendants told her that the full amount of every bill for services provided would be paid." *Id*.  Rather, the witness was told that the patient "was covered by the Plan and what the Plan paid for out-of-network services provided." *Id*.  When a claim was presented, the insurance company processed the claim and sent plaintiff the payment along with an explanation of benefits.  On occasion only partial payment of a claim was sent, along with an explanation of benefits.  Based upon this evidence, the Honorable Lee H. Rosenthal found that there were no misrepresentations.

The evidence for misrepresentations in the instant case is more slender than that in *Ambulatory Infusion.*  United cites to the many depositions of the DAC doctor owners who had no knowledge of communications with United on coverage matters, including specific dates, months, or years when the communications took place.  Doc. 486-12 at 64-65.  Exhibit 12 to Doc. 485 (United's Motion for Summary Judgment) is a chart of excerpts from the DAC plaintiffs doctor owners in which they confirmed that a verification of coverage is not a promise of payment. Doc. 486-12.

Exhibit 101 to United's Consolidated Motion for Summary Judgment (Doc. 489-38)

consists of two "Fax Eligibility Status" communications from United, one dated October 9, 2008 and the other dated May 7, 2008.  These Fax Eligibility Status documents were received by DAC plaintiff Redbird Foot and Ankle Surgery Center owned by Dr. Brian Zale.  Both documents state in all capital letters, "VERIFICATION OF COVERAGE IS NOT A GUARANTEE OF BENEFITS.   ACTUAL  PLAN  COVERAGE  AND  BENEFIT  PAYMENTS  ARE DETERMINED WHEN A CLAIM IS RECEIVED.  FOR MORE INFORMATION ABOUT PLAN  BENEFITS,  PLEASE  VISIT  OUR  IN  NETWORK  HOSPITAL  AND  PHYSICIAN PROVIDER WEB SITE. . . ."

Exhibit 102 to United's Consolidated Motion for Summary Judgment (Doc. 489-39) is a series of copies of eleven letters, dated in 2006 and 2007, sent to patients and DAC owner doctors, Meynard Nussbaum, D.P.M., Kevin Smith, M.D. and Brian Zale, D.P.M. with copies going to Palladium.  These letters set forth the patient names and a reference number.  The letters acknowledge that United had been notified that the patient was to be given outpatient treatment. The letter to Dr. Nussbaum contained the following language:

> This letter is not a statement of benefit coverage or a guarantee of the members' eligibility.  If benefits are available for these services, they will be reimbursed at the OUT-OF-NETWORK benefit level. . . . If you need eligibility or benefit coverage information, please call the toll-free number shown on the employee's ID card.  If benefits are available for these services, they will be considered according to the terms of the employees benefit plan.

The letters to the other DAC owner doctors, patients, and Palladium in Doc. 489-39 contained similar language.

Donald Kramer, Palladium's Rule 30(b)(6) witness testified that he had no knowledge of any representations by United that the claims at issue would be paid.  Doc. 486-31 at 18:15-

20:2, 21:14-25:2.   Similarly, DAC witness Brad Kovnat, Palladium's director of business development testified that he had no knowledge of any Palladium verification employee's conversations with any insurance companies. Doc. 486-30 at 9:8-10:3.   Again, DAC witness, Beverly Randall-Tillis testified that in verification telephone calls she had with United she did not recall if United "ever promis[ed] or guarantee[d] payment before a patient had his or her procedure," and that she understood "that there's a difference between a carrier verifying insurance benefits as opposed to guaranteeing payment." Doc. 487-19 at 5:17-6:3.   Although DAC has alleged in its Fourth Amended Complaint that United promised to pay "usual and customary rates" as facility fees, "provided they did not exceed the maximum pre-allowable facility fee set forth on United Healthcare's fee schedule." (Doc. 140, ¶ 65), there is evidence that no such fee schedule exists.  Palladium employee Brad Konvat testified that "there was no agreed-to fee schedule with United," (Doc. 486-30 at 11:9-10), that "as an out-of-network provider, Palladium did not have a written agreement with United," Doc. 486-30 at 16:13-17:1, and that "Palladium did not have a reimbursement schedule with United while [he was] employed with Palladium and Northstar." Doc. 486-30 at 18: 1-4.  Palladium's 30b(6) witness, Donald Kramer, testified that he did not know to what "fee schedule" ¶57 of the Fourth Amended Complaint (Doc. 140) was referring.  Doc. 486-31 at 26:24-27:19.  He further testified that he did not "know whether the reference to a Fee Schedule [in ¶ 57] is the one [he had] referred to that was provided as part of an in-network proposal or some other Fee Schedule," Doc. 286-31 at 28:8-13, and that "even after United provided the in-network Fee Schedule to Palladium, that Palladium didn't bill for facility fees based on that in-network schedule" because the rates were at too steep a discount. Doc. 486-31 at 29:3-24.

Exhibit 15 to United's Consolidated Motion for Summary Judgment (Doc. 286-15) is a

chart of excerpts of testimony from the DAC doctor owner witnesses testifying that they knew that their DAC entities and Palladium were out-of-network, and, as such, did not have contracts with United.

All of which leads to a discussion of the Ingenix database.  Ingenix, one of the named defendants in the Fourth Amended Complaint (Doc. 140), is a wholly owned subsidiary of United that collects information on, *inter alia*, facility fees charged by ASCs.  DACs' dubious argument is that the Ingenix database licensed by Palladium acting as an ASC facility, rather than the billing agent of the DACs, is the "fee schedule," which is alleged to have guaranteed the payment of facility fee bills referenced in the Fourth Amended Complaint (Doc. 140).  Donald Kramer, in his deposition, testified that he could not state that Palladium's charges were based solely on the Ingenix database Doc. 486-31 at 32:6-11. Kovnat testified that it was Palladium that subscribed to the Ingenix database, which contained a range of ASC facility charges for different CPT codes.  Doc. 486-30 at 14:10-15:23.

A Master Services and License Agreement ("MSLA") was entered into between Ingenix and Palladium Management, LLP on September 20, 2004.  Doc. 489-8.  A Product Schedule, which accompanied the MSLA,  provided at  ¶ I(C), ¶ IV(A):

> Any reliance upon, interpretation of and/or use of the Data by Customer is solely and exclusively at the discretion of Customer. Customer's determination or establishment of an appropriate reimbursement level or fee is solely within Customer's discretion, regardless of whether Customer uses the Data. Ingenix does not determine, on Customer's behalf, the appropriate fee or reimbursement levels for Customer and its business. Customer may use the Data (1) to create fee schedules . . . and (2) for reviewing or setting an allowable fee in adjudication and/or payment of healthcare bills submitted to Customer.

Exhibit 73 to United's Consolidated Motion for Summary Judgment (Doc. 489-9), is a "Management and Cost Sharing Agreement," which was entered into by Northstar Healthcare Acquisitions, L.L.C. [Northstar] and The Palladium for Surgery–Houston, Ltd. [Palladium] so that Northstar could assist "[Palladium] in managing and conducting the business affairs and services of [Palladium]" Doc. 489-9 at 2.   The Management and Cost Sharing Agreement provides that "Northstar will develop and maintain in connection with [Palladium] a Surgical Procedure Fee Schedule for facility fees (and not for professional fees) to be used in the day-to-day billing for [Palladium] services. . . . based on prevailing local rates as provided by surgeon/owners and other sources, fee information contained in databases owned by Northstar and other applicable sources." *Id*. at 6.

In his deposition testimony Brad Kovnat, director of business development of Palladium stated that Palladium used the "Ingenix database, information from local ASCs, and Houston-based ASCs and other databases to develop and update" the amounts it would charge for facility services. Doc 486-30 at  12:8-13:9; 14:1-8.

DAC is arguing that   Ingenix's license of a database and software to Palladium constitutes a United promise or guarantee to pay for facility services rendered at Palladium at rates contained in the database:   "The Professional Entities [DAC] did exactly what United suggested—they used the   database as a 'fee schedule' to set the Professional Entities' rates for out-of-plan claims." Doc. 510 at 39.   For this conclusion DAC cites to the statement of Donald Kramer (Doc. 512-67 at  ¶3), which states, "For determining its fees, Palladium subscribed to the Ingenix, Inc. database for facility fee charge data.  This subscription began on September 20, 2004.  The fees listed on the Ingenix database was the sole source of data that Palladium used to develop its fee schedule."   This statement directly contradicts the Rule 30(b)(6) deposition

testimony of Kramer, that he could not state that Palladium's charges were based solely on the Ingenix database. Doc. 486-31 at 32:7-11.[8]  Incorporated into the MSLA is a product schedule that expressly disclaims such use of or reliance on the database and leaves to Palladium the sole discretion on how it will use the database.  Doc. 489-8 at ¶¶ I(C) (Doc. 489-8 at 13) and IV(A) (Doc. 489-8 at 15).

United, in its Reply, points out a number of factual flaws with DAC's theory that the Ingenix data was the "fee schedule" referenced in the Fourth Amended Complaint.  Doc. 519 at 50-54.  United, the entity that processed and paid claims was not the licensor of the Outpatient Facility Module ("OPFM") licensed to Palladium.  As has been stated above, the express terms of the Master Services and License Agreement ("MSLA") provide that Palladium licensed the OPFM from Ingenix, an entity separate from United Healthcare Services, Inc., that does not process and pay claims.  Doc. 489-8.  There is no evidence that the OPFM was used to process any claims in this case.

Nor is there evidence that United marketed or sold the OPFM.  *Id*.  There is no evidence that United had access to or used the OPFM.  *Cf.*  Deposition of Carla Gee, Doc. 521-8.  Specifically, Ms Gee, the 30(b)(6) witness for Ingenix testified that Ingenix "did not license the MDR Outpatient Module to [United]" (*Id*. at 8:24-9:11 ); "United claims were not reimbursed using the Ingenix facility products" (*Id*. at 4:4-13, *Id*. at 7:3-5); "I don't believe [United] had a database of UCR rates."  (*Id*. at 3:11-17).

The Ingenix database was licensed to Palladium, not DAC.  Only Palladium was permitted to use the data by the terms of the MSLA. Doc. 489-8.  The MSLA expressly provides that the license is "non-transferable" and the "Customer [Palladium] shall have no right to allow

---

[8]  Such a post 30(b)(6) deposition,  self-serving,  statement cannot be used to raise a fact issue preventing a summary judgment. *Cf.*  page 13 above.

any person or entity who is not a party to this Agreement or an Affiliate of a party, to access the Software or Data directly or indirectly in any way." *Id*.  ¶ 1.3(a) and (b).  The MSLA provides that an "Affiliate" is "a company, which controls, is controlled by or is under common control with a party to this Agreement," and "control" means "majority ownership."  *Id*.  The MSLA further provides that if the customer, Palladium, wants to use a third party as its agent to access the software, the data, or a database of customer data produced through any software, Ingenix must approve the third party access, and further, the third party must sign an appropriate nondisclosure agreement with Palladium or with Ingenix."  *Id*. at ¶ 1(c).  The MSLA forbids the assignment or transfer of the agreement or any of the rights or licenses granted under it, without prior written consent of Ingenix.  Any attempted assignment without consent shall be considered void."  *Id*. ¶ 10.3.

Palladium and its affiliates were allowed to use the Ingenix data in the OPFM without the permission in writing of Ingenix, but DAC does not qualify as an affiliate of Palladium because the DACs  are each separately owned and controlled by the Doctors, and there is no evidence Palladium sought or obtained permission in writing to allow the use the OPFM data by DAC. Palladium entered into the MSLA with Igenix on September 20, 2004, before any of the DAC entities were formed and before DAC entered into the Billing Services Agreements with Palladium, which made Palladium DAC's billing agent.  *Cf*. Doc. 521-9.

DAC has cited to no evidence to support the allegation that United or Ingenix "marketed and sold" the OPFM to DAC, that the OPFM "was to be used to set [DAC's] rates for out of plan claims," or that United "suggested" that "[DAC] use[] the database as a 'fee' schedule' to set [DAC's] rates for out-of-plan claims." Doc. 510 at 39-40.

Even  if the Ingenix data that Palladium licensed could be considered a "fee schedule," it

is clear that it is not the "fee schedule" referenced, *inter alia* in ¶¶ 56 and 57 of the Fourth Amended Complaint because DAC can point to no evidence that raises a genuine issue of material fact that "United Healthcare published and provided a fee schedule that identified the maximum allowable facility fee associated with each medical procedure and service rendered." Doc. 140  ¶56.   Nor can the DACs point to evidence that raise genuine issues of material fact to establish that "United Healthcare provided a fee schedule to Plaintiffs' billing agent containing representations regarding the allowable facility fee associated with each covered medical service and treatment performed on United Healthcare's insureds at the ASC," and "Plaintiffs believed and had reason to believe that they were entitled to the usual and customary facility fee, provided that such fee did not exceed the pre-allowed facility fees reflected on United Healthcare's fee schedule  *Id*. ¶ 57.    DAC's convoluted arguments concerning the Ingenix data base are not convincing.

Related to this Ingenix database argument is plaintiffs' allegation that United represented that the facility fees "incurred and submitted by Plaintiffs would be compensated in accordance with the usual and customary rates," set forth in the "fee schedule," but "never mentioned that the UCR data was flawed and because of this Plaintiffs would be underpaid."  Doc. 140, ¶¶ 65-66.  If the usual and customary rate data is meant to equate to the information contained in the Ingenix database, DAC points to no evidence that there is a genuine issue of material fact that the data in the Ingenix database was flawed or that United paid DAC using flawed or inadequate data.  The only "evidence" of a flaw in the Ingenix database is derived from the testimony of Donald Kramer whose speculation was based on "popular press" at the "theoretical level" reporting an investigation of United by the Attorney General of New York.  Doc 486-31 at 34:6-21.  He admitted that he had no "basis to believe that the information that Palladium used from

the Ingenix database was flawed." *Id.* at 34:22-25.   Kramer's testimony, not based on his

personal knowledge and mere speculation, does not constitute evidence creating a genuine issue

of material fact to preclude a summary judgment.   United's Motion for Summary Judgment on

the DACs' Negligent Misrepresentation Claims will be granted.

**(3). Violations of Texas Insurance Code, DTPA**

Plaintiffs assert misrepresentation under Texas Insurance Code §§ 541.051, 541.052,

541.061; and the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. § 17.46

("representing that an agreement confers or involves rights, remedies, or obligations which it

does not have or involve, or which are prohibited by law"). Incorporating their argument for

negligent misrepresentation, plaintiffs base their claims on "United's representations during

verification phone calls with Palladium that procedures were valid, billable, and payable." Doc.

510 at 48.   Based upon the reasoning above regarding negligent misrepresentation, plaintiffs

point to no evidence establishing that there is a genuine issue of material fact that

representations were made during the verification telephone calls, that an agreement conferring

rights, remedies, or obligations was made.   Therefore, United's Motion for Summary Judgment

as to the plaintiffs' claims relating to Violations of Texas Insurance Code, DTPA will be granted.

**(4). Promissory Estoppel**

"The elements of a promissory  estoppel claim are: (1) a promise; (2) reliance thereon

that was foreseeable to the promisor; and (3) substantial reliance by the promisee to his

detriment." *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 378-79 (Tex. App.-- Houston [1st

Dist.] 2007, no pet.) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)). Although the

existence of a contract, including mutual assent and consideration, are not required, "the asserted

'promise' must be sufficiently specific and definite that it would be reasonable and justified for

the promisee to rely upon it as a commitment to future action." *Landmark Org., LP v. Tremco Inc.*, 2010 WL 2629863, at *6-7 (Tex. Ct. App. Jul. 30, 2010). Finally, a court will not enforce the promise unless "injustice can be avoided only by the enforcement of the promise." *See Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 864 (5th Cir. 1999). Plaintiffs allege United promised during verification phone calls that it would pay Facility Fees. Doc. 140 ¶ 92.   Again, plaintiffs have failed to point out any evidence that United specifically promised to pay facility fees and that it would be reasonable to rely on such a promise. Therefore, United's Motion for Summary Judgment as to the Plaintiffs' claims of Promissory Estoppel will be granted.

**(5).** *Quantum Meruit* **& Unjust Enrichment**

Unjust enrichment and *quantum meruit* claims fail  because they seek disgorgement based on healthcare services provided to patients. Plaintiffs cannot recover under these causes of action from United, because plaintiffs did not provide healthcare services to United. *See Electrostim Med. Services, Inc. v. Health Care Serv. Corp.*, 962 F. Supp. 2d 887, 898 (S.D. Tex. 2013), *rev'd in part on other grounds*, 13-20649, 2015 WL 3745291 (5th Cir. June 16, 2015) ("Courts have refused to recognize an unjust enrichment or *quantum meruit* cause of action based on healthcare services provided to a participant or beneficiary of a healthcare insurance policy or plan") (listing cases). Therefore, United's Motion for Summary Judgment as to the Plaintiffs' claims of unjust enrichment and *quantum meruit* will be granted.[9]

Having granted United's Summary Judgment on the contract, misrepresentation, Texas Insurance Code/DTPA, promissory estoppel, and *quantum meruit* and unjust enrichment claims, there is no need to consider United's motion on claims of lack of standing, lack of a real party in interest under Rule 17, statute of limitations, and ERISA preemption.

---

[9] As United's Motion for Summary Judgment is granted as to all of Plaintiffs' claims, it is unnecessary to address the Plaintiffs' Motion for Summary Judgment on Defendants' Affirmative Defenses (Doc. 500).

**B.  The Doctors' Motion to Dismiss and Motion for Summary Judgment Dismissing United's Counterclaims and Plaintiffs' Motion for Summary Judgment Dismissing Defendants' Affirmative Defenses.  Doc. 500**

**Par's, Euston's, and Dr. Cohen's Motion for Summary Judgment on United's Counterclaims Doc. 491**[10]

In its First Amended Counterclaim United seeks a declaratory judgment that it is not liable for any pending facility fees for services provided at Palladium because the facility fees are unlawful and fraudulent. Doc. 316 ¶¶ 226, 227.  In addition, United seeks a declaratory judgment that plaintiffs' facility fee-sharing agreements are void *ab initio* on the basis of illegality. Doc. 316 ¶ 231.

**(1).  Private Right of Action**

Plaintiffs argue United lacks standing, because its counterclaims are "based on alleged violations of statutes under which United has no private right of action." Doc. 500 at 14. Plaintiffs rely on *Gaalla v. Citizens Med. Ctr.*, in which the Honorable Janis Jack denied a motion for declaratory judgment that a hospital violated the federal anti-kickback statute, because the statute did not provide a private right of action. No. 6:10-cv-14 (S.D. Tex. June 30, 2010), 2010 WL 2671705.  "Although the Fifth Circuit has not definitively ruled on this issue, courts within this Circuit to have considered this issue have concluded that declaratory judgment under 28 U.S.C. § 2201 is not available where the substantive statute at  issue does not provide a private right of action." *Id*. at *4.  *Gaalla* cites two other district court cases denying declaratory judgment. *Association of American Physicians & Surgeons, Inc. v. U.S. Dep't of Health &*

---

[10] The Doctors' and the DACs' Motion to Dismiss/for Summary Judgment on the United Counterclaims are so similar to the motion filed by Par, Euston, and Dr. Cohen, that they will be analyzed together.

*Human Servs.*, 224 F.Supp. 2d 1115, 1129 (S.D. Tex. 2002) (denying declaratory judgment as to violation of Paperwork Reduction Act, which "by its express terms" did not provide a private right of action but only a defense to administrative enforcement) and *RGB Eye Associates, P.A. v. Physicians Resource Group, Inc.*, 1999 WL 980801, at *10 n. 9 (N.D. Tex. Oct. 27, 1999) (denying declaratory judgment as to violation of anti-kickback statute, which "does not confer subject matter jurisdiction on this court.").

United argues private rights of action are not required. Doc. 506 at 84. "Texas courts and federal courts throughout the country have explained that, even if a statute under which a party seeks a declaration does not provide a private cause of action, a plaintiff may still maintain a declaratory judgment action to obtain a ruling that the defendant violated that statute." United cites four cases supporting its position: *Hancock v. Baker*, 263 Fed. Appx. 416, 419-420 (5th Cir. 2008); *Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.*, 907 F. Supp. 1019, 1026 n.6 (W.D. Tex. 1995), *aff'd as modified,* 105 F.3d 1035 (5th Cir. 1997); *Sec. Indus. Assoc. v. Bd. of Governors of the Fed. Reserve*, 628 F. Supp. 1438, 1441 (D.C.C. 1986); *Zimmer, Inc. v. NU TECH Med. Inc.*, 54 F. Supp. 2d 850, 864-64 (N.D. Ind. 1999).

In United's Sur-reply in Opposition to Counter-defendants' Consolidated Motion for Summary Judgment (Doc. 525) United references it's Response, Doc. 506, at 69, n. 35,  at 73-74 and 84 that "explained that it was not asserting a private right of action under these [state and federal] laws, but rather, based its Counterclaims on 'the public policy in Texas that a party cannot recover for claims that arise from its own illegal or fraudulent conduct, as well as [on] plan provisions.'" Doc 525 at 23.  United argues that *Gaalla* is not applicable to this case because the plaintiffs in that case "expressly sought a declaration 'that [d]efendants' actions violated . . .the Texas Health and Safety Code and the Anti-Kickback Statute," neither of which

provides for a private cause of action." Doc. 525 at 23.  United maintains it is not seeking a declaration "that [counter-defendants] violated the Texas Health and Safety Code and [/or] the Anti-Kickback Statute," (quoting *Gaalla* at 2010 WL 2671705 at *5),  nor is it asserting in its counterclaims "a private right of action under the Texas and federal laws." Doc. 525 at 23. Rather, it explains, United "seeks two declaratory judgments that are based on both the public policy in Texas that a party cannot recover for claims that arise from its own illegal or fraudulent conduct and plan provisions, namely that:  (1) United 'is not liable for any of the pending charges for facility fees for services provided at Palladium'; and (2) 'that the EU Arrangements that the Shell Companies entered into with Palladium are void *ab initio*.'"  Doc. 525 at 24, citing Amended Counterclaim, Doc. 336, ¶¶ 227, 231 and Doc. 506 at 69 n. 35, 73-74, and 78-79.

United alleges plaintiffs' agreements with Palladium violated state and federal licensing and anti-kickback laws.

In regard to licensing laws, United alleges the agreements "enabled the unlicensed Shell Companies to operate an ASC, Palladium, without a license" and "unlawfully ceded control over surgeries conducted in its operating rooms to the Shell Companies." Doc. 316 ¶ 132 (citing Texas Ambulatory Surgery Center Act, Tex. Health & Safety Code § 243.003 (2013) ("[A] person may not establish or operate an ambulatory surgical center in this state without a license.")).  United seeks to prove that plaintiffs were shell companies without operational control of Palladium. Whether or not plaintiffs fraudulently represented that they operated an ASC, they point to no evidence any of them ever actually operated one.

Second, United alleges the Use Agreement unlawfully "permitted more than one entity to 'use' the same ASC facility." *Id*. (citing 25 Tex. Admin. Code § 135.23(a) ("An ambulatory surgical center (ASC) license is issued only for the premises and person or governmental unit

named on the application.")). The cited regulation provides only conditions of licensure and does not bar licensed ASCs from letting others use their facilities for a fee.

Third, United alleges the Use Agreement "effectively transferred and assigned its license to [plaintiffs]." *Id.* (citing 25 Tex. Admin. Code § 135.23(d) ("No license may be transferred or assigned from one person to another person.")).

In August 2006 Texas Mutual Insurance Company submitted a complaint to the Texas Department of State Health Services (TDSHS) alleging Palladium was in violation of 25 Tex. Admin. Code § 135.23(a) and/or (d). Ex. N, Doc. 500-14. TDSHS reported:

> Unable to substantiate that this practice allows  assignment of license # 008009 for The Palladium for Surgery - Houston, L.L.P. to another entity. The ASC retains responsibility for the activities conducted on the premises. The ASC requires that physicians be credentialed by the ASC and that the non-owner physicians abide by the ASC's governing/medical staff bylaws and rules and regulations.

Doc. 500-14 at 4.

This report from the TPSHS does not establish as a matter of law that Palladium did not unlawfully transfer its license to the DACs by means of the use agreements.

In regard to anti-kickback laws, United alleges Palladium's sharing of Facility Fees with plaintiffs violates three state criminal anti-kickback statutes: the Texas Patient Solicitation Act, Tex. Occ. Code § 102.001 (prohibiting "remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency"); Tex. Occ. Code § 165.155 (prohibiting remuneration from a "physician [who] employs or agrees to employ, pays or promises to pay, or rewards or promises to reward any person, firm, association, partnership, or corporation for securing or soliciting a patient or patronage"); and Tex. Pen. Code § 32.43 (Commercial Bribery) (prohibiting remuneration from a physician or other fiduciary who "solicits, accepts, or agrees to

accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary"). In addition, United alleges the fee-sharing arrangement violated the Federal Anti-Kickback Statute, which prohibits "remuneration . . . for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b. The Federal Anti-Kickback Statute is similar to the Texas Patient Solicitation Act but applies only to referrals for services paid by federal health care programs, not by private insurers such as United. *Id.*

The second prong of the Federal Anti-Kickback statute, for example, broadly prohibits remuneration for "purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C.A. § 1320a-7b(b)(1)(B). Here, United alleges Palladium paid plaintiffs "to unlawfully induce the Doctor Owners to *use* Palladium, as opposed to other ASCs." Doc. 316 at ¶92 (emphasis added). This allegation corresponds directly to the terms of the Use Agreement. Doc. 500-2 ¶ 1 ("[Palladium] hereby grants to [FSS-Houston] the right to use, subject to the terms and conditions hereof, the premises . . . ."). Plaintiffs' share of Facility Fees under the use agreements arguably constitutes remuneration for "purchasing, leasing, ordering, or arranging for . . . [a] facility" from Palladium. *Id.* The Texas statute similarly prohibits remuneration for "securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency." Tex. Occ. Code § 102.001. Plaintiffs' share of Facility Fees under the Use Agreement arguably constitutes remuneration for "securing patronage" of Palladium's facility and services. *Id.*

United's argues that *Gaalla*,'s holding that,  because the state and federal laws in

question do not provide for private causes of action, United  cannot secure a declaratory judgment that it is not liable for facility fee charges because the DACs violated state and federal law, is inapplicable.   This Court agrees.   The DAC's motion to dismiss and for summary judgment of United's declaratory judgment cause of action will be denied.

## C. United's Counterclaim of Fraud

In its counterclaim, United asserts common law fraud. Doc. 316 ¶ 215-219. The elements of fraud in Texas are: "(1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co.*, *L.C.*, 348 S.W.3d 194, 217 (Tex. 2011). A "misrepresentation" may include an omission when there is a duty to disclose. *Reynolds v. Murphy*, 188 S.W.3d 252, 270 (Tex. App.—Fort Worth 2006, pet. denied).

Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Fifth Circuit interprets Rule 9(b) to require "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess*, *Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177–78 (5th Cir.1997), *cert. denied*, 522 U.S. 966 (1997)).

United alleges the DACs concealed their fee-splitting arrangement with Palladium by

submitting fraudulent claims.  The DACs each entered into fee-splitting arrangements which included two agreements, an Ambulatory Surgical Center Use Agreement ("Use Agreement") and a Billing Services Agreement ("Billing Agreement"). Each Use Agreement split Facility Fees between Palladium and a plaintiff, the latter passing its half of the fees to a counter-defendant Doctor, the sole owner and employee of the DAC entity. The Use Agreement granted the Plaintiff "use" of the facility at times listed in an attached schedule in exchange for a "Use Fee" consisting of 45% of the Facility Fees paid on claims submitted to United:

> For and in consideration of entering into this Agreement, [FSS-Houston] agrees to pay to Company a monthly fee (the "Use Fee") equal to (i) forty-five percent (45%) of the "net monthly collected revenues" . . . defined as all funds collected by Practice or its authorized agent as payment for patient services provided by Practice at the ASC.

Doc. 489-1  ¶ 7.

As noted above, The Doctors collected their physician fees.  The DAC plaintiffs collected facility fees.  The Use Agreement specifically provided that the Use Fee did not include Physician Fees. Doc. 500-2 ¶ 6 ("Fees for physician services rendered in the ASC shall be billed separately by [Plaintiff]."). Thus, "net monthly collected revenues" consisted of Facility Fees. The definition of net monthly collected revenues as "payment for patient services provided by" is misleading because Palladium, not the Plaintiff DAC, provided the services for which Facility Fees were charged.

The Use Agreement required Palladium to provide all utility and "support services," including staff, bear all operational and maintenance expenses, and retain "ultimate control" over the operation of the facility. The Use Agreement further stated it would "not result in any change to the ASC License" held by Palladium. In an email to one of the Doctors, Palladium described the Use Fee as a "management fee," reflecting Palladium's provision of staff in addition to equipment and space. Doc. 318-8, Doc. 318-3.  In emails to other Doctors, Palladium admitted it

provided the "facility service." Doc. 318-9, Doc. 318-10.  Yet the DACs maintain they "provided services," without explaining what those services were.  Plaintiffs have provided no evidence that they provided space, equipment, or any services at the facility, except for physician services for which the Doctors charged and were paid physician fees. On the contrary, the Use Agreement shows plaintiffs used Palladium's services, equipment, and space in exchange for a Use Fee. Doc. 500-2 ¶¶ 1, 7, 11. Plaintiffs delegated to Palladium the filing of their formation documents, TIN applications, bank account and lockbox applications, and Facility-Fee claims.  Plaintiffs' tax returns show they had no operating assets, employees, or facility expenses, except for minimal administrative fees. Doc. 490-5, 490-6.  Some plaintiffs' tax returns described their income from Palladium as "passive income," Doc 490-36, indicating the business from which the taxpayer derives income is one in which the taxpayer does not materially participate." Doc.490-36; discussion at Doc. 506 at 14-17.  Some plaintiffs paid Palladium its share of Facility Fees with checks marked "rent" or "lease." Doc 490-4.

The only obligation placed on the Plaintiff under the Use Agreement was to maintain general liability insurance, including professional liability insurance, against claims arising from its own negligence in its use of the facility. Doc. 489-1,¶ 12.  The Plaintiff and Palladium each agreed to indemnify each other for losses caused primarily by the other party. In sum, according to United, the Plaintiff was essentially a shell company purporting to provide facility services, but that did not provide any facility services and that was formed for the purpose of collecting a 55% kickback or share of the Facility Fees charged to United for space, equipment, and services provided by Palladium.

**Fraud.**

The DACs and the Doctors have moved for summary judgment on United's counterclaim

for fraud.  United first points out that

> As a preliminary matter, summary judgment is rarely proper on
> fraud claims because they involve issues such as intent and
> reliance which turn heavily on circumstantial evidence and the
> credibility of witnesses and, thus, are within the purview of the
> trier of facts. *See HEI Resources East OMG, JV v. Evans*, 413 Fed.
> Appx. 712, 715 (5th Cir. 2011) (quoting *Rimade Ltd. v, Hubbard
> Enters., Inc.*, 388 F.3d 138, 144 (5th Cir. 2004) ("[T]he intent
> required to establish fraud is a factual question uniquely within the
> realm of the trier of fact because it depends upon the credibility of
> witnesses"))

Doc 506 at 52.

United has mustered copious evidence, circumstantial and otherwise, to establish that

there are genuine issues of material fact that exist as to each of the elements required to establish

fraud.  *Cf.* Doc. 506 at 10-38, 52-72, 91-95, 116-126 together with cited exhibits.

United has explained the affirmative misrepresentations made to United on the facility

fee bills.  After the Doctor performed a procedure at Palladium, Palladium, on behalf of the

corresponding DAC, would submit a claim to United using a standard UB-04 health insurance

claim form.  Examples of this form are at  Doc. 507-1.   These claim forms themselves constitute

the legal basis for United's fraud claims.

Beverly Randall-Tillis was Palladium's Business Office Manager and plaintiffs'

designated billing expert in this case.  She testified that she understood that CMS [Centers for

Medicare and Medicaid] is a federal agency that oversees the Medicare and Medicaid programs.

Doc 487-19 at 11:3-8.   She further testified that she and her employees consulted the CMS

Manuals for guidance as to how to bill.  Doc. 487-19 at 11:9-25- 12:1-9.  She also testified that

she is "aware that the UB claim form is a form that was developed to submit claims to the

Federal Government" and that it is "submitted to the Federal Government in some cases."  Doc

487-19 at 12:11-15;  18-20.  She understood the CMS is "an authority as to how a claim form

should be coded." Doc. 487-19 at 12:17-13:3. Randall-Tillis identified the CMS Manual on "how to bill certain forms," and that it was her "understanding that in general practice that carriers, including United, follow the CMS guidelines." Doc. 487-19 at 13:8-15:20.

Testifying about a chart in the CMS for the UB-04 form, Doc. 507-2, Randall-Tillis agreed that the chart indicated that "Form Locator 1 is also referred to as Box 1 of the UB-04 form." Doc. 487-19 at 15:22-16:12. She further agreed that the "chart indicates that the Provider Name should be listed on UB forms in Form Locator 1, Line 1." Doc. 487-19 at 17:12-23. She also agreed that nowhere on the claim form is there a place to show the location where the services are rendered. *Id* at 1-19. She also agreed that according to the chart in the CMS for the UB-04 form, if Palladium were listed in Box, 1, Line 1 of the UB-04 form, that would be a representation that Palladium was the Provider Name. *Id*. at 19: 18-24.

United argues that claims forms were submitted to United in four different ways, each of which contained affirmative fraudulent misrepresentations:

> (1) Palladium is identified as the provider in Box 1, the Shell Company is identified in Box 2 as the payee/billing agent, and the TIN [tax identification number] does not belong to the licensed ASC [Palladium], but to the unlicensed Shell Company; (2) Palladium is identified as the provider in Box 1, the Shell Company is identified in the bottom right-hand corner box as the 'provider representative,' and the Shell Company's TIN was used; (3)Palladium is identified as the provider in Box 1 and uses the Shell Company's TIN, but there is no reference to the Shell Company's name anywhere on the bills; and (4) the Shell Company is identified as the provider in Box 1, its own TIN is used, and there is no reference to Palladium.

Doc. 506 at 54.

Categories one and two of the claim forms misrepresent that the claim is submitted on behalf of Palladium, as the provider of the facility services (box 1), and the DAC is represented as the payee, presumably Palladium's billing agent. Doc. 486-23, at 4:16-6:2 (transcript of Stacy

Chalupsky[11]); Doc. 486-9 (chart reflecting deposition testimony regarding DAC's use of Palladium's name in Box 1 of UB forms, representing Palladium as the provider of facility services. ) ; Doc. 487-19 (transcript of Beverly Randall Tillis) at 11:24-13:25, 14:8-15:20, 8:22-9:12, 17:12-18:19, 19:18-14; Doc. 507-2 (Excerpt of CMS Manual).

This information is arguably false for two reasons:  First, because the DACs were not Palladium's billing agents; they were seeking reimbursement in their own right as purported providers of ASC facility services and Second; under the use agreements Palladium was serving as the DACs' billing agent, not the provider.  See Doc. 508-9 at 14:11-16:19; Doc. 140 at ¶ 45 n. 1 and ¶ 82.  These claims raise a genuine issue of material fact that United did not and could not have known that "the shell company was purporting to collect 100 percent of the facility fee on its own behalf."  Doc. 508-9 at 16:11-19.

The third category of claim forms misrepresent that Palladium, the licensed ASC, seeks to collect facility fees for services it provided itself, when actually the DACs, whose TINs were used on these claims, were seeking to collect the payments under the terms of the EU Agreements, for providing ASC facility services, which they did not in fact provide.  Doc. 508-9 at 16:20-17:15, 18:18-19:23.

In the fourth category of claim forms the DACs misrepresent in box 1 that they are licensed  ASC providers, entitled to payment because they lawfully provided facility services. Doc. 508-9 at 20:24-21:4.  Texas Health & Safety Code ***Sec. 243.003 provides that an ASC cannot operate without a license, each ASC must be separately licensed, and an ASC license is not transferable or assignable.  The DACs admitted they are not licensed and they are not facilities.  Doc. 486-1 and 486-2 (charts of Doctor owners' testimony that the DACs are not

---

[11]Stacy Chalupsky was a Senior Recovery Investigator who worked for United on the investigation of the DAC claims. Excerpts from her deposition can be found at Doc. 486-22, Doc. 486-23, and Doc. 508-8 and Doc. 508-9

licensed and are not facilities, respectively).

Par's and Euston's claim forms, United argues in its response to Par's, Euston's and Dr. Cohn's Motion for Summary Judgment (Doc. 511), misrepresent that the claim was submitted on behalf of Palladium as the provider of the facility services and that Par or Euston was the payee, Palladium's billing agent.  Palladium is identified as the provider in Box 1, Par and Euston are identified as the payee/billing agent in Box 2, and the TIN does not belong to the licensed ASC, but to the unlicensed Par or Euston. Doc. 486-23 at 4:16-6:2;  Doc. 494 and 494-1 bills submitted to United by Par; Doc. 495 (bills submitted to United by Euston).

Dr. Cohen, the owner of Par and Euston, admitted in his deposition that "Palladium" in Box 1 of the billing form represented that Palladium, neither Par nor Euston, was the "provider" of the facility services.  Doc. 508-10 at 34:13-23, 38 at 11-21.  United argues in its response to the counter-defendants' motion to dismiss and motion for summary judgment that in August 2008, after noticing high billing rates and being notified about the Use Agreements, United began a fraud investigation, tracking the different numbers on each Palladium claim. Doc. 506 at 45.   In October 2008, United further argues, that it determined that at least some of the claims were seeking payment for facility services to entities that were not licensed facilities, and it started denying plaintiffs' claims. *Id*. at 46.

The summary judgment record raises genuine issues of material fact that the DAC plaintiffs made (1) material misrepresentations in submitting Facility Fee claims to United, (2) knowingly or recklessly as to the falseness of the claims, (3) with intent that United pay Facility Fees in reliance on the claims, and (4) causing United to justifiably rely on the representation. *See Exxon*, 348 S.W.3d 217. The claims forms are unambiguous documents that satisfy the who, what, when, and why of Rule 9(b). United has also provided excerpts of relevant testimony from

the Doctors, demonstrating they all understood the DACs  were unlicensed companies that did not provide ambulatory surgical facility services and provided a conduit whereby Palladium and the Doctors shared facility fees.  Docs. 486–1 through 486-21, Docs. 486-26, 486-28, 486-29, 486-31, 486-33 ; 487-2 through 487-18, 487-20, 487-21, 487-23; 489-1 through 489-47; 507-9, 507-18, 507-28, 507-42, 5007-47; 508-2 through 5, 408-10, 508-11, 508-18, 508-19 through 508-23; 509-2 through 509-6. The arrangement here is similar to billing fraud schemes in criminal cases. *United States v. Iloani*, 143 F.3d 921, 923 (5th Cir. 1998); *see also State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc.*, 14-CV-10266, 2014 WL 5427170, at *3 (E.D. Mich. Oct. 24, 2014). Therefore the Court will deny the DAC plaintiffs' and Par & Euston's Motion for Summary Judgment as to United's claims of fraud.[12]

### D. United's Counterclaim of Money Had and Received

United also asserts a counterclaim for money had and received to recover the facility fee amounts paid to the DACs.  This claim depends upon the genuine issues of material fact raised by United in its fraud counterclaim discussed above.

"To prove a claim for money had and received, a plaintiff must prove a defendant holds money that belongs to the plaintiff in equity and good conscience." *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951).   The only issue that is left to be addressed with respect to this counterclaim is the issue of whether the money had and received should be barred by the statute of limitations.

In the DAC's and Doctors motion to dismiss under 12(b)(6), (Doc. 500 at 20) the counter defendants maintain first that United's money hand and received counterclaim is barred by limitations because the limitations period for such an action is two years.  They cite the Texas

---

[12] For the same reasons, Plaintiffs' Motion to Dismiss United's claim of fraud and Motion for a More Definite Statement regarding the fraud claims (Doc. 500 at 37) are also denied.

Supreme Court as categorically declaring that "[u]njust enrichment claims are governed by the two-year statute of limitations in section 16.003 of the Civil Practice and Remedies Code." *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W. 3d 869, 871 (Tex. 2007).

Two arguments are raised by the counter-defendants in their Reply in Support of the Doctors' Consolidated Motions. Doc. 517. First they argue that "United's money had and received claims are barred by the applicable two-year statute of limitations." 518 at 9. The counterclaims are based on the submission and payment of fraudulent facility fee bills (Doc. 316 at ¶¶ 221-222), and United alleges that they discovered the injury by "late 2008 and early 2009" (Doc. 316 at ¶ 171), more than two years before the counterclaims (Doc. 141) were first filed on July 2, 2012.

The law in Texas is not clear on this topic. The Supreme Court of Texas has not spoken, and we are left with two conflicting cases. The first case, *Amoco Production Company v. Smith,* 946 S.W. 2d 162, 165 ( Tex. App.–El Paso 1997) held, after an analysis of the history of limitations law in Texas, that "money had and received is an action for debt, governed by the four-year statute of limitations. *See Stone v. First City Bank of Plano, N.A.* 794 S.W.2d 537, 542-43 (Tex. App.–Dallas 1990, writ denied)." The second case *Merry Homes, Inc., v. Luc Dao*, 359, S.W. 3d 881, 883 (Tex. App.–Houston [14[th] Dist.] 2012, no pet.) held, "Because money had and received is an equitable doctrine designed to prevent unjust enrichment, the proper statute of limitations for such a claim is that applicable to claims for unjust enrichment." The Fourteenth Court of Appeals relied for this holding on another Fourteenth Court of Appeals case , *Autry v. Dearman*, 933 S.W. 2d 182, 190 n.7( Texas App–Houston [14[th] Dist.] 1996, writ denied) which noted in *dicta* that "plaintiff's claims for money had and received and unjust enrichment would be barred by the two-year statute of  limitations," but dismissed the money had and received

claim on a different ground.  *Id*. at 189-90.  The Fourteenth Court in *Merry Homes* also cited three Supreme Court of Texas cases, *Elledge v. Friberg-Cooper Water Supply Corp*., 240 S.W. 3d 869, 871 (Tex. 2007) (*per curium*); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W. 3d 732, 737 (Tex. 2001; and *HECI Exploration Co. v. Neel*, 982 S.W. 2d 881, 885 (Tex. 1998) as supporting the two year statute of limitations for money had and received, but all three of those cases were unjust enrichment cases, not for money had and received.

   Both parties agree that if there is any confusion in the state law, the Court is bound by the Fifth Circuit's most recent holding.  Counter-defendants cite *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400 (5th Cir. 2004) for the application of a two year statute of limitations to money had and received, but it concerns only an unjust enrichment claim.   The latest holding on the issue, according to United is the Fifth Circuit's decision in *Peerless Ins. Co. v. Tex. Commerce Bank,* 791 F.2d 1177, 1179  (Fifth Cir. 1986), which applies a four year statute of limitations for causes of action for money had and received.  The Court will follow the Fifth Circuit's precedent and holds that United's claim for money had and received is not barred by limitations.

   In Section B of the motion for summary judgment, the DACs and the Doctors argue that "United's own internal records, deposition testimony, and other evidence prove that there is no dispute of material fact that United had actual knowledge of the facts giving rise to United's cause of action–and actual knowledge of its causes of action. . .more than four years before" United filed its counterclaims. Doc 500 at 39.  United's claims are for a declaratory judgment that the counter-defendants acted fraudulently in billing United for facility fees that they did not provide.  United also claims money had and received by the counter-defendants, by reason of common law fraud.  Both claims of fraud and money had and received have a four year statute of limitations.   United argues that its declaratory judgment claim has a four year statute of

limitations because the underlying act was fraud.  Beginning on page 39 of their motion to dismiss and for summary judgment on United's counterclaims, and continuing through and onto page 59, counter-defendants argue that United's counterclaims accrued more than four years before United filed them on July 2, 2012, that they are time-barred and for that reason should be dismissed.  Doc. 500 at 39-59.

The Supreme Court of Texas has held that a cause of action accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R. V.*, 933 S.W. 2d 1, 4 (Tex. 1996).  Based upon alleged undisputed facts listed in the motion, the DACs and the Doctors maintain that United knew they had claims for payments made to the DACs before July 2, 2008, four years before the counterclaims were filed.

There are exceptions to the legal injury rule, but United has the burden to prove it is entitled to exercise the exception.  *KPMG Peat Marwick v. Harrison County Fin. Corp.*, 988 S.W. 2d 746, 749 (Tex. 1999); *J. M. Krupar Constr. Co. v. Rosenberg*, 95 S.W. 3d 322, 329 (Tex. App.–Houston [1st Dist] 2002, *no pet.*).

Among the exceptions to the legal injury rule is the discovery rule, which "change[s] the accrual of the limitations period from its actual date to a later date:  either (1) the date the injury is actually discovered, or (2) the date the injury should have been discovered if the plaintiff had exercised reasonable diligence." Doc 500 at 42, citing *BP Am. Prod. Co. v. Marshall*, 342 S.W. 3d 59, 65-66 (Tex. 2011); *S.V.*, 933 S.W. 2d at 4.  In some sixteen pages of their brief (Doc 500 at 42-57 ), the DACs and the Doctors argue the facts that they maintain show that  "not only was United's alleged injury not inherently undiscoverable, but United also had actual knowledge of the alleged injury and the facts giving rise to the injury more than four years before United filed

its Counterclaims."  Doc. 500 at 44.

The counter-defendants quote from a Supreme Court of Texas case, *BP Am. Prod. Co.*, 342 S.W. 3d 59, 65-66 (Tex. 2011), which holds "the discovery rule is applied . . .  [if] 'the nature of the injury is inherently undiscoverable and the evidence of injury is objectively verifiable.'"  (quoting from *Trinity River Auth. v. U.S. Consultants, Inc.* 899 S.W. 2d 259, 264 (Tex. 1994).  Doc. 500 at 42.

After quoting ¶215 of the United's first amended counterclaim (Doc. 316), counter-defendants spend fourteen pages outlining all of the information available to United, which counter-defendants argue is proof that the nature of the injury was not inherently undiscoverable and the evidence of injury is objectively verifiable. 500 at 43-57.   Their argument is that United should have discovered what United has alleged to be a fraud because United 'had unfettered access to the public records and other information that allowed it to (1) confirm tax identification numbers, (2) identify each entity associated with tax identification numbers, (3) determine the owner of the entity, and (4) determine whether each entity held an ambulatory surgical center license."  Doc. 500 at 44.

In United's Response (Doc. 506) United counters these arguments by maintaining that they are "fatally flawed for a number of reasons. . . ." Doc 506 at 95.  United, beginning on page 32 of its Response to Counter-Defendants' Motion to Dismiss and Motion for Summary Judgment, sets out a factually supported time line of its investigation of how the EU's worked and the relationship among the DACs, the Doctor Owners, and Palladium. Doc. 506 at 39. United maintains that the investigation into Palladium and the DACs took "well over a year" to "identify the connections between the actual provider who provided services, the shell company, Palladium, if Palladium was on the claim, and the tax identification number."

United has raised genuine issue of material fact concerning its discovery of the fraud scheme it alleges against the counter-defendants.  If United can prove these facts are correct, and United did not discover the fraud scheme until late 2008 at the earliest, United's counterclaims, which have a four year limitations period, were timely.  There remains a genuine issue of material fact as to when United's counterclaim causes of action accrued.  Counter-defendants have not negated the discovery rule, raised by United, by showing "as a matter of law that there is no genuine issue of material fact about when [United] discovered, or in the exercise of reasonable diligence should have discovered the nature of the injury." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W. 2d 746, 748 (Tex. 1999).

United alleges the counter-defendants and Palladium "conceal[ed] the actual relationships that the shell companies had with Palladium." Doc. 508-9 at 22:16-23:18; 29:7-21.  In order to determine that the DAC collecting the fee was owned by the doctor who actually performed the service, United had to "investigate each and every claim submission that came through to identify the connections. . . ." *Id.* United argues that, under these circumstances, the fraudulent concealment exception to limitations is also applicable.  The DACs and the Doctors argue that the fraudulent concealment exception to limitations does not apply.  To establish this exception a party must prove both that the opposite party "concealed the conduct complained of," that is, engaged in "affirmative acts of concealment and that the party claiming the exception "failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Texas v. Allan Constr. Co. Inc*., 851 F.2d 1526, 1528 (5th Cir. 1988).  The DACs and the Doctors maintain that "United's internal documents, deposition testimony, and the remaining evidence cited in this motion preclude application of the fraudulent concealment doctrine." Doc. 500 at 57.  The information cited by the counter-defendants, in hindsight, may seem compelling,

but there are genuine issues of material fact raised by United that make it impossible to determine, as a matter of law, that there was no fraudulent concealment.  Because there are genuine issues of material fact concerning the facts surrounding the discovery of the injury and fraudulent concealment, DACs' summary judgment on the counterclaims for declaratory judgment, fraud, and money had and received must be denied.

Not only does United maintain that under the discovery exception and the fraudulent concealment doctrine, it could not have discovered until late 2008 or early 2009, less than four years before the counterclaim was filed, but because the counterclaims were compulsory, they relate back to the filing of the original complaint by DAC, April 8, 2011.

The Court held, in ruling on a motion to dismiss (Doc. 344) filed by the companies, Par and Euston, owned by Dr. Cohen, plaintiffs in a removed state case that was consolidated with the case filed by DAC, as discussed at the beginning of this opinion, that "[c]ompulsory counterclaims . . . generally relate back to the filing of the complaint," and "a claim is compulsory if it arises out of the same transaction or occurrence as the claim,"  The Court went on to hold "[h]ere, the claims and counterclaims are all based on the validity of the facility fee payments."  Doc. 501, at 3.

Although DAC and the Doctors argue that the counterclaims are not compulsory, the Court has already found that they are.  Thus "United's Counterclaims would, in any case, relate back to April 8, 2011, the date when [DACs'] Original Complaint was filed." Doc. 506, at 95.

Rule 13(a) states that "[a] pleading must state as a counterclaim--any claim that at the time of service-- the pleader has against an opposing party if the claim:  (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. . . ."

The Fifth Circuit holds that "[f]our tests. . . define when a claim and counterclaim arise

from the same transaction" *Plant v. Blazer Financial Services*, *Inc.* 598 F.2d 1357, 1360 (5th Cir.

1979).

These four tests are

> 1.  Are the issues of fact and law raised by the claim and counterclaim    largely the same?
> 2.  Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
> 3.  Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
> 4.  Is there any logical relation between the claim and the counterclaim?

*Id.*, citing 6 Wright & Miller, Federal Practice and Procedure Sec. 1410 at 42-43 (1971).

"An affirmative answer to any of the four questions indicates the counterclaim is

compulsory." *Id.* United's Counterclaims satisfy at least three of the four tests. The issues of

law and fact in both sets of claims are the same, i.e. whether the DACs are entitled to collect

payment for facility services that were provided by Palladium, pursuant to the EU agreements.

The same evidence will support or refute the respective causes of action of the DACs and

United, including the claims submitted by the DACs and Palladium to United, the explanation of

benefits, the provider remittance forms, checks, correspondence between United and Palladium

and correspondence between United and the DACs, the EU Agreements, internal

communications and memos, and testimony of the various persons with knowledge. There is a

logical relationship between the DACs' and United's causes of action. As the Fifth Circuit said

in *Plant*, "[T]he test which has commended itself to most courts. . .is the logical relation[ship]

test," which asks if "the counterclaim arises from the same 'aggregate of operative facts' in that

the same operative facts serves as the basis of both claims. . . ." *Plant*, at 1360-61.

The plaintiffs filed the Original Complaint (Doc. 1) on April 8, 2011, alleging that United

had not paid or had underpaid all payments made to plaintiffs. The Fourth Amended Complaint

was filed July 2, 2012,  alleging claims for *quantum meruit*, negligent misrepresentation, breach of implied contract, promissory estoppel, and violations of the Texas Insurance Code. Doc. 140. United's counterclaims for fraud, money had and received, and declaratory judgment were also filed July 2, 2012. Doc. 141.  The same claims at issue in the Fourth Amended Complaint, that all claims that United paid were underpaid and all unpaid claims should be paid, are also at issue in United's First Amended Counterclaim, Doc. 316, that all unpaid claims are not owed and it should recover from counter-defendants all amounts paid because of counter-defendants' fraud. Because, as we have seen,  the same claims are at issue in plaintiff's and counter-plaintiff's causes of action, the counterclaims are compulsory, and the time for filing the counterclaims relates back to the time the original complaint was filed on April 8, 2011.  6 Wright & Miller Federal Practice & Proc. Sec. 1419 (2d ed. 1990).  All three of United's claims, being fraud or derived from fraud, are subject to the four year statute of limitations, and were not barred as of the filing of the DACs' and the Doctors' original complaint, April 8, 2011.

The side issue in need of discussion is that of which law, federal or state, applies to the relation back doctrine.  United's counterclaims are compulsory and relate back to the filing date of the Original Complaint, April 8, 2011.  Counter-defendants argue that the Court should apply the Tex. Civ. Prac. & Rem. Code Sec. 16.069 (the "Texas Relation-Back Statute") not the federal relation-back rules in Rule 13 (a) and federal case law to United's compulsory counterclaims. Doc. 517 at 16-17.  Under Texas law compulsory counterclaims are not tolled indefinitely.

United points out that the Fifth Circuit has held that pleadings, amendments, and the relation-back doctrine are procedural matters to be governed by federal law.  *Hensgens v. Deere & Co.*, 869 F.2d 879, 880 (5th Cir. 1989), *cert denied*, 493 U.S. 851 (1989) held that "federal law regarding relation back of amendments to pleadings is controlling in diversity cases in federal

court."  In *Kansa Reins. Co. v. Cong. Mortg. Corp. of Texas*, 20 F.3d 1362, 1366 n.4 (5th Cir. 1994).  "Once litigation involving a particular transaction has been instituted, the parties should not be protected by [statutes of limitations] from later asserted claims that arose out of the same conduct set forth in the original pleadings." *Flores v. Cameron Cty., Tex.* 92 F.3d 258, 272 (5th Cir. 1996) (quoting *Kansa*, 20 F.3d at 1366-67.  The Court finds that because federal, not state, law relation-back applies, the United's counterclaims would not time-barred.

Because the counterclaims are compulsory pursuant to Rule 13(a), they relate back to April 8, 2011 when plaintiffs/counter-defendants' filed their Original Complaint.

**E. Par's, Euston's, and Dr. Cohen's Motion for Reconsideration of Motions to Dismiss (Doc. 505)**

This motion asks that the Court reconsider its Order Denying Plaintiffs' Motions to Dismiss (Doc. 501) on the grounds that (1) "the Court's denial of Dr. Cohen's limitations defense was based on the false assumptions that Dr. Cohen is a plaintiff," (2) "the 'relation back' doctrine does not preclude Par's and Dr. Cohen's limitations defense in this case due to United's failure to invoke the doctrine properly" and (3) "Par's, Euston's, and Dr. Cohen's Motions to Dismiss United's money-had-and-received claims were not moot." Doc. 501 at 5, 6, 9.

Motions for reconsideration "should not be used to raise arguments that could, and should, have been made before entry of [the order] or to re-urge matters that have already been advanced by a party."  *eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp.2d 745, 749 (E.D. Tex. 2012).

The first argument of the motion is Dr. Cohen's argument that the Court was mistaken in treating him as a counter-defendant in the case, pointing out that he was not a plaintiff when the case was first filed in Texas state court, and thus could not be a counter-defendant.  He is, rather,

a third-party defendant, brought into the case by defendants, when they filed counterclaims against Par and Euston who were plaintiffs in the state case.  Thus, he argues, the filing of the "counterclaim" against Dr. Cohen cannot relate back to the date when Par and Euston filed their state court petition against defendants.  United responds by first pointing out that this argument could have been, but was not, made in the motion to dismiss.  Second, United argues  that " the Counterclaims are compulsory and relate back to the date of Par and Euston's Complaint, making them timely."  Third, United argues that "any timely claims against Par and Euston are also timely as to Dr. Cohen because Dr. Cohen is the alter ego of Par and Euston."  Doc. 514 at 5.

Rule 13(a) provides, "(a) Compulsory Counterclaim.  (1) In General.  A pleading must state as a counterclaim any claim that –at the time of its service–the pleader has against an opposing party if the claim:  (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. . . ."  Courts within the Fifth Circuit construe Rule 13(a) and the relation back doctrine broadly.  *Plant v. Blazer Fin. Servs*. 598 F.2d 1357, 1360 (5th Cir.1979).  The Fifth Circuit applies "the logical relation test" to determine when a claim and counterclaim arise from the same transaction or occurrence. *Id*. at 1360-61.  The term "opposing party" is construed broadly to include parties who are "alter egos."  Transamerica, 292 F.3d at 390; *see also Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.*, 478 F.2d 191, 193 (2nd Cir. 1973).

Dr. Cohen's  argument that the counterclaims against him cannot be compulsory because he was not a named plaintiff in the original suit filed in state court against Par and Euston, and his argument that the counterclaims against him "could not have arisen out of the transaction that was the subject matter of [Par and Euston's] claims" because he did not file a claim against

United, are not convincing.  Doc. 505 at 4-5.

In paragraphs 2, 33, 107 of and Exhibit 10 to United's Amended Counterclaim (Doc. 316) United has sufficiently alleged that Par and Euston were the alter egos of Dr. Cohen.  The Court has previously found as noted on page 51 of this Opinion and Order that the counterclaims filed against Par and Euston are compulsory and relate back to the date of their state court petition.

The other two issues raised in Par, Euston's, and Dr. Cohen's motion to reconsider (Doc. 505), (1) relation back was not properly applied by United and (2) the statute of limitations on United's money had and received limitations claims had passed, were also raised by the DACs in their motion for summary judgment and are addressed above in this Opinion and Order.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED that United's Consolidated Motion for Summary Judgment as to All of Plaintiffs' Causes of Action (Doc. 485) is GRANTED.  It is further

ORDERED that Par's, Euston's, and  Dr. Cohen's Motion for Summary Judgment on United's Counterclaims (Doc. 491) is DENIED.  It is further

ORDERED that The Doctors' Motion to Dismiss and Motion for Summary Judgment Dismissing United's Counterclaims and Plaintiffs' Motion for Summary Judgment Dismissing Defendants' Affirmative Defenses (Doc. 500) is DENIED.  It is further

ORDERED that Dr. Cohen's, Par's and Euston's Motion for Reconsideration of Motion to Dismiss (Doc. 505) is DENIED.

SIGNED at Houston, Texas, this 8th day of December, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE