# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| DAC SURGICAL PARTNERS, P.A. *et al.*,<br><br>     Plaintiffs,<br>  v.<br><br>UNITED HEALTHCARE SERVICES, INC. and INGENIX, INC.,<br>     Defendants.<br>  –and –<br><br>UNITED HEALTHCARE SERVICES, INC.<br><br>     Counter-Plaintiff,<br>  v.<br><br>DAC SURGICAL PARTNERS, P.A., *et al.*,<br><br>     Counter-Defendants. | Civil Action No. 11-cv-01355<br><br>District Judge Melinda Harmon |

**DEFENDANTS UNITED HEALTHCARE SERVICES, INC.'S AND INGENIX, INC.'S
MOTION FOR SUMMARY JUDGMENT AS TO
<u>PLAINTIFFS PAR SURGICAL, PLLC AND EUSTON ASSOCIATES, PLLC</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................ 1

II.  FACTS RELEVANT TO PAR AND EUSTON ............................................. 2

    A.  Dr. Cohen's Communications with United ............................................. 4

    B.  Dr. Cohen's Communications with Palladium ....................................... 7

    C.  The United Fee Schedule ................................................................ 7

    D.  Dr. Cohen's Knowledge of the Fraud/Kickback Scheme ........................ 8

III.  STATEMENT OF RELEVANT UNDISPUTED FACTS ............................... 11

IV.  SUMMARY JUDGMENT STANDARD .................................................... 11

V.  LEGAL ANALYSIS .......................................................................... 13

    A.  United Is Entitled To Summary Judgment On The Negligent Misrepresentation Claim. ............................................................................................ 13

        1.  There Is No Evidence Of Any Misrepresentations By United. ............... 13

            a.  No Promises Of Payment ............................................... 14

            b.  No Fee Schedule Setting Forth Maximum Pre-Allowed Rates .... 16

        2.  There Is No Evidence That Plaintiffs Relied On Any False Representations By United. ............................................................................... 17

        3.  There Is No Evidence Of Damages. ........................................... 17

    B.  United Is Entitled To Summary Judgment On The Breach Implied-In-Fact Contract Claim. ..................................................................................... 18

    C.  United Is Entitled To Summary Judgment On The Insurance Code Claims. ....... 20

    D.  United is Entitled to Summary Judgment on the Texas Business & Commerce Code ................................................................................... 22

    E.  United Is Entitled To Summary Judgment On The Quantum Meruit Claim. ........ 23

    F.  United Is Entitled To Summary Judgment On The Promissory Estoppel Claim. 26

VI.     ARGUMENTS FROM CONSOLIDATED MOTION FOR SUMMARY JUDGMENT 27

 A.     Par and Euston Lack Standing To Pursue Causes Of Action Against United For Payment Of Facility Fees. ..................................................................................... 27

  1.     Article III Standing ................................................................................ 27

   a.     Shell Companies Suffered No Injury-In-Fact ............................ 28

   b.     Shell Companies Cannot Assert A Legally Protected Interest. .... 32

 B.     The Shell Companies' Causes Of Action Are Barred By Applicable Statutes Of Limitations. ........................................................................................................ 33

VII.    CONCLUSION .................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Addicks Servs., Inc. v. GGP-Bridgeland, LP,*
    596 F.3d 286 (5th Cir. 2010). ................................................... 26

*Adventist Health Sys./Sunbelt Inc. v. Medical Sav. Ins. Co.,*
    2004 WL 6225293 (M.D. Fla. March 8, 2004)........................ 25

*Alexander v. Grand Prairie Ford, L.P.,*
    2007 WL 1576260 (N.D. Tex. May 31, 2007) ................................. 13, 35

*Allstate Ins. Co. v. Watson,*
    876 S.W.2d 145 (Tex. 1994)................................................ 21

*Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Ins. Co.,*
2007 WL 320974 (S.D. Tex. Jan. 30. 2007) ("*AITS I*")…….....…………….…...........….14, 34

*Ambulatory Infusion Therapy Specialist, Inc. v. N. Am. Adm'rs, Inc.,*
    262 S.W.3d 107 (Tex. App.–Houston [1st Dist.] 2008) (*"AITS II"*) ........................... 33, 34, 35

*Atlantic Lloyds Ins. Co. v. Butler,*
    137 S.W.3d 199 (Tex. App.–Houston [1st Dist.] 2004) ........................................ 21

*Balawajder v. Johnson,*
    2004 WL 51263 (Tex. App.–Houston [14 Dist.] 2004)............................................ 35

*Banet v. Fonds de Reg. et de Controle Cafe Cacao,*
    2010 WL 1066993 (Del. Ch. 2010)……………………………………………………...29

*Barrios v. Great Am. Assur. Co.,*
    2011 WL 3608510 (S.D. Tex. Aug. 16, 2011) ...................................................... 21

*Bell v. Am. Traffic Solutions, Inc.,*
    371 F. App'x 488 (5th Cir. 2010) ...................................................... 32

*Broad Street Surgical Ctr., LLC v. UnitedHealthGroup, Inc.,*
    2012 WL 762498 (D.N.J. Mar. 6, 2012)................................................ 25

*Busch v. Basic Organics, Inc.,*
    2007 WL 603385 (N.D. Tex. 2007)........................................................ 28

*Bykov v. Radisson Hotels Int'l, Inc.,*
    221 F. App'x 490 (8th Cir. 2007) .........................................................28-29

*Cameron v. Terrell & Garrett, Inc.,*
    618 S.W.2d 535, 539 (Tex. 1981)……………………………………………………….23

*Camp v. Ruffin*,
    30 F.3d 37 (5th Cir. 1994) ...................................................................... 17

*Caplinger v. Allstate Ins. Co.*,
    140 S.W.3d 927 (Tex. App.–Dallas 2004).............................................. 21

*Cash Rent-A-Car, Inc. v. Old Am. Cty. Mut. Fire Ins. Co.*,
    2010 WL 143482 (Tex. App.–Houston [1 Dist.] 2010)……………...…………...….22, 23

*Cedars Sinai Med. Ctr. v. Mid-West Nat. Life Ins. Co.*,
    118 F. Supp. 2d 1002 (C.D. Cal. 2000) …………………………………………...………..25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)…………………………………………………………………...12

*Chitsey v. Nat'l Lloyd's Ins. Co.*,
    698 S.W.2d 766 (Tex. App.–Austin 1985) ............................................ 17

*Crawford v. GuideOne Mut. Ins. Co.*,
    420 F. Supp. 2d 584 (N.D. Tex. 2006) ................................................... 23

*DAC Surgical Partners, P.A. v. United Healthcare Services, Inc.*,
    2011 WL 5006598 (S.D. Tex. Oct. 20, 2011).................................. 14, 24

*Dean v. Frank W. Neal & Assoc., Inc.*,
    166 S.W. 3d 352 (Tex. App.–Fort Worth [2d Dist.] 2005)................. 36, 37

*Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*,
    364 F.3d 269 (5th Cir. 2004). ............................................................... 27

*Dept. of Prot. & Reg. Svs. v. Schutz*,
    101 S.W.3d 512 (Tex. App.–Houston [1st Dist.] 2002) ......................... 33

*Diaz v. Superior Energy Servs., LLC*,
    341 F. App'x 26 (5th Cir. 2009) ............................................................ 12

*DIRECTV Inc. v. Robson*,
    420 F.3d 532 (5th Cir. 2005) ................................................................ 12

*Eastern Exp., LP v. XTO Energy, Inc.*,
    2012 WL 1059080 (Tex. App.–Fort Worth 2012)................................... 17

*Encompass Office Solutions, Inc. v. Ingenix, Inc.*,
    775 F. Supp. 938, 960-61 (E.D. Tex. 2011)……………………...………...22-23, 24-25

*Esty v. Beal Bank S.S.B.*,
    298 S.W.3d 280 (Tex. App.–Dallas 2009)............................................. 17

iv

*Fankhauser v. Fannie Mae,*
   2011 WL 1630193 (E.D. Tex. Mar. 30, 2011) ........................................................ 13

*Fidelity Nat'l Title Ins. Co. v. Doubletree Partners, L.P.,*
   2011 WL 4715174 (E.D. Tex. Oct. 5, 2011) ........................................................ 16

*Fleming & Assocs. v. Miller & Assocs.,*
   2005 WL 1155118 (S.D. Tex. 2005) ........................................................ 25

*Frost Crushed Stone Co., Inc. v. Odell Geer Const. Co., Inc.,*
   110 S.W.3d 41 (Tex. App.–Waco 2002) ........................................................ 28

*Garner v. United States,*
   424 U.S. 648 (1976) ........................................................ 31

*Garrett v. Phillips Mills, Inc.,*
   721 F.2d 979 (4th Cir. 1983) ........................................................ 31

*Gillum v. Republic Health Corp.,*
   778 S.W.2d 558 (Tex. App.–Dallas 1989) ........................................................ 19

*Health Enrich. & Longevity Ins., Inc. v. State,*
   2004 WL 1572935 (Tex. App.–Austin 2004) ........................................................ 33

*Heard v. Godwin,*
   2009 WL 960187 (S.D. Tex. 2009) ........................................................ 32

*Hugh Symons Grp, PLC v. Motorola, Inc.,*
   292 F.3d 466 (5th Cir. 2002) ........................................................ 12

*Jordan v. Sony BMG Music Entm't, Inc.,*
   637 F. Supp. 2d 442, 452 (S.D. Tex. 2008)…………………………………………………....18-19

*Joseph M. Still Burn Ctrs., Inc. v. Amfed Nat. Ins. Co.,*
   702 F. Supp. 2d 1371 (S.D. Ga. 2010) ........................................................ 25

*Kaltreider v. Comm'r,*
   28 T.C. 121 (1957) ........................................................ 31

*Kona Tech. Corp. v. Southern Pacific Transp. Co.,*
   225 F.3d 595 (5th Cir. 2000) ........................................................ 28

*Landmark Org., LP v. Tremco Inc.,*
   2010 WL 2629863 (Tex. App.–Austin 2010) ........................................................ 26

*Lawfinders Assoc. Inc. v. Legal Research Ctr.,*
   2002 WL 1940112 (5th Cir. 2002) ........................................................ 17

*Lee v. ABC Carpet & Home,*
  186 F. Supp. 2d 447 (S.D.N.Y. 2002) ................................................................. 31

*Mack v. Talasek,*
  2012 WL 1067398 (S.D. Tex. 2012) .................................................................... 31

*Mednick v. Albert Enterpr., Inc.,*
  508 F.2d 297 (5th Cir. 1975) ............................................................................... 31

*Mendes v. Comm'r,*
  121 T.C. 308 (2003) ............................................................................................. 31

*Mid-Town Surg. Ctr., LLP v. Blue Cross Blue Shield of Texas, Inc.,*
  2012 WL 1252512 (S.D. Tex. Apr. 11, 2012) ...................................................... 24

*Milestone Props., Inc. v. Federated Metals Corp.*
  867 S.W.2d 113 (Tex. Ct. App. 1993) ................................................................. 35

*Morris v. Covan World Wide Moving, Inc.,*
  144 F.3d 377 (5th Cir. 1998) ............................................................................... 12

*Oliphant Fin., LLC v. Patton,*
  2010 WL 936688 (Tex. Ct. App Mar. 17, 2010) .................................................. 18

*Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.,*
  393 S.W.3d 379 (Tex. App.– Dallas 2012) .......................................................... 23

*Parra v. Markel Int'l Ins. Co.,*
  300 F. App'x 317 (5th Cir. 2008) .................................................................... 20-21

*PKF Business Sys., Inc. v. www. Zipworld.com, Inc.,*
  2002 WL 1285574 (N.D. Tex. June 6, 2002) ...................................................... 28

*Prestige Ford Garland Ltd. Partnership v. Morales,*
  336 S.W.3d 833 (Tex. App.–Dallas 2011) ........................................................... 35

*Provident Life & Accident Ins. Co. v. Goel,*
  274 F.3d 984 (5th Cir. 2001) ............................................................................... 12

*Quigley v. Bennett,*
  256 S.W.3d 356 (Tex. App.–San Antonio 2008) ................................................. 35

*Real v. Driscoll Strawberry Assoc., Inc.,*
  603 F.2d 748 (9th Cir. 1979) ............................................................................... 31

*Rivera v. Wyeth-Ayerst Labs.,*
  283 F.3d 315 (5th Cir. 2002) ......................................................................... 27, 28

*Ryan v. Brookdale Int'l Sys., Inc.*,
   230 F. App'x 366 (5th Cir. 2007) ................................ 28

*Salas v. Carpenter*,
   980 F.2d 299 (5th Cir. 1992) ................................ 12

*Salazar-Limon v. City of Houston*,
   826 F.3d 272 (5th Cir. 2016) ................................ 12

*Schwartz v. Gregg*,
   2010 WL 2977479 (Tex. App.–Austin 2010) ................................ 13, 16

*Scionti v. First Trust Corp.*,
   1999 WL 35134588 (S.D. Tex. 1999) ................................ 36, 37

*Stewart Title Guar. Co. v. Mims*,
   405 S.W.3d 319 (Tex. App.–Dallas 2013) ................................ 19

*Tarrant Dialysis Ctrs., Inc. v. Coresource, Inc.*,
   2005 WL 1201021 (N.D. Tex. 2005) ................................ 26

*Travelers Indem. Co. of Conn. v. Losco Group, Inc.*,
   150 F. Supp. 2d 556 (S.D.N.Y. 2001) ................................ 25

*Valores Corp., S.A. de C.V. v. McLane Co., Inc.*,
   945 S.W.2d 160 (Tex. App.–San Antonio 1997) ................................ 20

*Verrando v. ACS State & Loc. Solutions, Inc.*,
   2009 WL 2958370 (N.D. Tex. Sept. 15, 2009) ................................ 33

*W. Square Inv., Inc. v. W. Nat. Bank of Amarillo, Tex.*,
   1998 WL 102569 (Tex. App.–Amarillo 1998) ................................ 35

*Wagner & Brown, Ltd. v. Horwood*,
   58 S.W.3d 732 (Tex. 2001) ................................ 35

*Waring v. Comm'r*,
   412 F.2d 800 (3d Cir. 1969) ................................ 31

*Wendt v. 24Hour Fitness USA, Inc.*,
   821 F.3d 547 (5th Cir. 2016) ................................ 27

*Willis v. Roche Biomed. Lab.*,
   61 F.3d 313 (5th Cir. 1995) ................................ 12-13, 27

**Statutes**

25 T.A.C. § 135.1 ................................................................................................ 32

Tex. Bus. & Com. Code § 17.46(b)(12) ............................................................ 23

Tex. Civ. Prac. & Rem. Code § 16.003(a) ......................................................... 35

Tex. Civ. Prac. & Rem. Code § 16.051 .............................................................. 35

Tex. Health & Safety Code § 243.003 ........................................................ 10, 32

Tex. Ins. Code § 541.051(1) ............................................................................... 21

Tex. Ins. Code § 541.162(a) ............................................................................... 35

**Other Authorities**

*Crigler*, T.C. Memo. 2003-93 ........................................................................... 31

Defendants UnitedHealthcare Services, Inc. ("UHS") and Ingenix, Inc. ("Ingenix") (collectively "United"), pursuant to Federal Rule of Civil Procedure 56, hereby move for summary judgment against Plaintiffs Par Surgical, PLLC ("Par") and Euston Associates, PLLC ("Euston") (collectively "Plaintiffs" or the "Shell Companies") as to all of the Shell Companies' causes of action set forth in their Original Petition ("OP").  In support of its Motion, United states as follows:

## I.   __INTRODUCTION__

On December 12, 2016, this Court issued a 56-page Opinion and Order granting United's Motion for Summary Judgment against the DAC plaintiffs and each of their claims for negligent misrepresentation, breach of implied contract, Texas Insurance Code violations, quantum meruit, promissory estoppel, breach of contract, and unjust enrichment ("SJ Order").  Dkt. 541.

On January 8, 2017, Par and Euston filed a Motion for Reconsideration taking the position that all their claims had been dismissed as well: "The new circumstance, however, is that the Court has now granted summary judgment against Plaintiffs on all causes of action. As such, Plaintiffs no longer have any claims for facility fees that United needs to defend against by a showing of illegality." Dkt. 544 at 19.  Importantly, Par and Euston, who's counsel brought and signed the Motion for Reconsideration, expressly defined Par and Euston as "Plaintiffs" at the outset of their Motion: "For simplicity's sake, the term 'Plaintiffs' is used herein to refer to all of the doctors ("Doctors") and physician entities ("Entities") that are either plaintiffs, counter-defendants, or third-party defendants in this case." Dkt. 544 at 1.

It made sense for Par and Euston to take such a position because the claims in their OP are the same as those in the DAC plaintiffs' Fourth Amended Complaint ("FAC").  Just as the FAC included claims for negligent misrepresentation, breach of implied contract, Texas Insurance Code violations, quantum meruit, and promissory estoppel, so too did the OP.  *See* OP, Exhibit 1, at 4-6.  Moreover, the allegations in the OP were based on the same core facts as the FAC.  For example,

1

the OP alleges that "United made independent promises" and "agreed to pay Plaintiffs" for facility services. *Id*. at 4 and 5. Similarly, the FAC alleges that United made an "independent promise to pay Plaintiffs for the facility fees . . . . Dkt. 140 at ¶ 63. The OP also makes the false allegation that United "provided Plaintiffs with a fee schedule." Exhibit 1 at 3. The FAC repeats this false allegation multiple times: "United Healthcare published and provided a fee schedule . . . ." Dkt. 140 at ¶ 56.

On August 2, 2017, the Court denied Par and Euston's Motion for Reconsideration in a 31-page Order and Opinion ("Reconsideration Order"). Dkt. 573. In it, the Court affirmed its earlier SJ Order emphasizing the lack of evidence supporting the core allegations in the FAC. Despite moving for reconsideration and having identical claims, based on virtually identical core allegations, Par and Euston now take the position that their claims are still viable and advise the Court that "they will be able to present evidence sufficient to defeat" a summary judgment motion. Dkt. 649 at 2. Par and Euston are wrong.

As discussed in detail below, the Shell Companies do not and cannot offer any evidence to support their claims. Accordingly, United respectfully requests that the Court grant its Motion for Summary Judgment.

## II.    FACTS RELEVANT TO PAR AND EUSTON

On September 4, 2008, Dr. Scott Cohen formed Par. *See* Par's Interrogatory Answers at 4, attached hereto as Exhibit 2. Dr. Cohen served as its sole officer, director, member, and employee until October 3, 2011, when he assigned his entire interest to Dr. Kramer's shell company, the Don of Pain. *Id*.; *see also* Cohen dep. at 80:25, 81:1-2, 127:15-17, attached here to as Exhibit 3. Similarly, on June 24, 2009, Dr. Cohen formed Euston. *See* Euston's Interrogatory Answers at 4, attached hereto as Exhibit 4. Dr. Cohen also served as its sole officer, director, member, and employee until October 3, 2011, when he assigned his entire interest to the Don of

Pain.  *Id*.; Ex. 3 at 80:22-24, 127:18-20.  Despite Par and Euston only being affiliated with procedures at The Palladium for Surgery – Houston, LLP ("Palladium"), Dr. Cohen explained that he set up his shell companies for "tracking" and "accounting" purposes.  Ex. 3 at 15:5-15.

Par and Euston both entered into Use Agreements and Billing Services Agreements (collectively "EU Agreements") with Palladium.  *See* EU Agreements for Par and Euston, attached hereto as Exhibits 5 and 6, respectively; *see also* Ex. 3 at 112:21-25, 113:1-11.  For the three years Dr. Cohen operated under the Par/Palladium EU Agreement, he performed at least 15 procedures on United members and collected more than approximately $169,202.22. Ex. 2 at 7 (identifying claims at issue).  Similarly, from 2009-2011, when Dr. Cohen operated under the Euston/Palladium EU Agreement, he performed at least 33 procedures on United members and collected approximately $548,766.66. Ex. 4 at 7 (identifying claims at issue).

On December 22, 2010, after all the major insurers discovered the fraud and kickback scheme among Palladium and all the affiliated shell companies and ceased paying any EU claims, Palladium turned on Par and Euston (as it did on the other shell companies), and sued them to recover $427,275.19; Palladium's alleged half of the facility fee payments.  Notably, just as United alleged in its counterclaims that the Doctor Owners were the "alter egos" of their respective shell companies, Palladium made the same allegation against Dr. Cohen with respect to Par and Euston. *See* Palladium's Original Petition at 2 (alleging that Dr. Cohen is the "alter ego"), attached hereto as Exhibit 7.

On October 3, 2011, Par, Euston, and Dr. Cohen settled with Palladium.  Under the terms of their agreement, Dr. Cohen agreed to pay Palladium $407,000 and transfer all his interest in Par and Euston to Dr. Kramer's shell company, the Don of Pain.  *See* Settlement and Release Agreement, attached hereto as Exhibit 8.  In return, Dr. Cohen would receive whatever kickback

money Dr. Kramer could collect after he filed a lawsuit against United on behalf of Par and Euston. Palladium and its parent company, Northstar Healthcare, Inc., also agreed to indemnify Dr. Cohen if he were named as a counter-defendant by United. *Id.*

On December 17, 2012, Dr. Kramer followed through and caused Par and Euston to file a copycat lawsuit against United in the District Court of Harris County. Ex. 1. Indeed, at his deposition, Dr. Kramer testified that although he could not recall, "it wouldn't surprise" him if he acquired Par and Euston just so he could sue United. *See* Palladium Rule 30(b)(6) dep. at 15:1-6, attached hereto as Exhibit 9.[1] United timely removed the case and consolidated it with the DAC plaintiffs in this Court. Dkts. 243 and 288.

The allegations Par and Euston make in the OP are remarkable not merely because they are wholly unsupported by any evidence, but also because Dr. Cohen contradicts them in many material respects. The following sections illustrate these contradictions.

### A.    Dr. Cohen's Communications with United

The OP alleges that Dr. Cohen, on behalf of Par and Euston, "before each and every surgery . . . contacted a representative of United to receive pre-authorization that the surgery and facility fees were covered under the insurance contract." Ex. 1 at 3. It further alleges that "United made independent promises to Plaintiffs which induced Plaintiffs to incur surgical and facility expenses." *Id.* These allegations culminate with Par and Euston claiming that "United agreed to pay Plaintiffs for discharging [United's] contractual obligations" and that "United promised to provide coverage and pay the fees associated with the use of the ASC by pre-approving and confirming insurance coverage." *Id.* at 5-6.

---

[1] The recently produced Don of Pain tax returns confirm that it is merely a shell company whose sole purpose is to own Par and Euston while shielding Dr. Kramer from creditors and personal liability. The 2011-2013 tax returns show that it has no employees, no income in 2011 and 2013, and virtually no expenses. *See* 2011-2013 Don of Pain tax returns attached here to as group Exhibit 10.

However, Dr. Cohen, the only representative of Par and Euston who ever had any communications with United regarding procedures at Palladium, *see* Ex. 3 at 70:15-20, testified as follows about his contacts with United:

> I don't remember any specifics or specific patient names or anything like that.  And – and the – where I would assist in this process is contacting United Healthcare to provide clinical information that's relevant to the preauthorization process, and passing that information on to Palladium.

*Id*. at 58:3-10.

> Q.    Do you recall the names of any individuals, United employees that you spoke to?
> A.    No.

*Id*. at 61:6-8.

> Q:    And when you would speak with a representative of United, would you – would United guarantee payment?
> A:    United Healthcare would provide authorization for the services.
> Q:    Could you explain to me what—what you meant—mean by "provide authorization."
> A:    Meaning in their – they would determine that the treatment was medically necessary and the treatment to be provided was a covered benefit under the patient's plan. That's – that's the whole process.
> Q:    That the procedure was a covered benefit under the plan?
> A:    That's correct.
> Q:    Would they say, "We promise to pay 100 percent of the facility fee billed to you – to United"?
> A:    They would not use those words.
> Q:    Would they say, "We promise to pay 100 percent of the professional fee that Dr. Cohen bills to United"?
> A:    They would not say that.
> Q:    Would they ever use the word "guarantee"?
> A:    No.

*Id*. at 73:1-25.  In fact, the only time that United used the word "guarantee" is when it sent letters to Dr. Cohen, Palladium, and patients, advising them that the pre-authorization or certification process was ***not*** a guarantee of payment.  For example, on January 14, 2009 and February 24, 2009, in response to pre-certification requests, United sent letters to Dr. Cohen, Palladium, and the

5

respective patients, expressly advising them that "the information in this letter does ***not*** guarantee payment or represent a treatment decision."  *See* Exhibits 11 and 12 (emphasis added).

As this Court previously found in the SJ Order, Dr. Cohen's testimony is consistent with the dearth of evidence about United's alleged promises or guarantees of payment:

> The only witness who actually participated in these verification calls, Beverly Randall-Tillis, testified that in verification telephone calls she had with United she did not recall if United 'ever promis[ed] or guarantee[d] payment before a patient had his or her procedure," and that she understood 'that there is a difference between a carrier verifying insurance benefits as opposed to guaranteeing payment.

SJ Order at 17.

In contrast, Dr. Cohen definitively recalled concealing from United the true nature of the illegal relationship Par and Euston enjoyed with Palladium:

> Q:    When you would speak with a United representative, would you tell the United representative that you had a Use Agreement and Billing Agreement with Palladium?
>
> A:    No.  I would call on behalf of Par or Euston, and they would understand that the surgery was to be performed at The Palladium, but the specifics of – of – you know, regarding mentioning whether there was a Use Agreement in place for that United Healthcare representative on the phone, that – that's not a topic that would come up.

Ex. 3 at 61:9-19.

> Q:    Would you tell United your relationship with Par and Euston?
>
> A:    No.
>
> Q:    Would you tell United that you were the owner or sole shareholder of Par and Euston?
>
> A:    No, no.
>
> Q:    Would you ever provide any details of Par and Euston to United?
>
> A:    No, because it wasn't relevant during this type of – of communication. So no, I wouldn't.

*Id*. at 67:11-21.

Q:      Would you disclose to United that Palladium would be taking 50 percent of the facility fee and that Par and Euston would be collecting 50 percent of the user fee?

Mr. Watt:        Objection; form.

A:      No.

*Id*. at 72: 13-18.

**B.      Dr. Cohen's Communications with Palladium**

Although Par and Euston allege that United made similar promises of payment to Palladium involving their patients, Dr. Cohen—Par and Euston's sole owner, officer, and employee—testified he has no knowledge of any such conversations:

Q.      And would Palladium employees also make calls to United regarding a specific procedure?

Mr. Altsuler:  Objection; form.

A.      You'd have to check with them.  I don't – I don't know.

Ex. 3 at 64:21-25.  Additionally, when asked to identify anyone at Palladium with whom he spoke about his communications with United, Dr. Cohen testified that "I don't remember the names of – of the people at The Palladium . . . ."  *Id*. at 66:20-21.

**C.      The United Fee Schedule**

Par and Euston allege (just as the DAC Plaintiffs did) that:

United had previously provided Plaintiffs with a fee schedule that included the maximum fees that would be covered.  As such, the schedule contained fees pre-determined by United to be within the expectations of the industry. . . .  The fees charged by Plaintiffs were 25% less than the pre-approved maximum fees allowable.  Since the fees were within the pre-approved schedule and had twice been approved, Plaintiffs believed and had reason to believe that the fees bills to United would be covered.

Ex. 1 at 3.  After Dr. Cohen was shown these very allegations at his deposition, the following colloquy occurred:

Q.      Do you know what fee schedule this is referring to?

A.      I do not.

Q.      Have you ever seen this fee schedule that is referenced in – on Page 3?

. . .

7

A. I don't know – I don't know what fee schedule they're referencing in this sentence.

Q. Are you – do you have an in-network contract, you personally, with United?

A. Not me personally.  You mean my practice?

Q. Your practice.

A. It does – I do not.

Q. Okay.  Do you know what the term 'fee schedule' generally relates to?

A. Yes.

Q. What is it?

A. It relates to a schedule of fees in terms of what would be reimbursed for particular services.

Q. And has Par or Euston – had Par or Euston ever enter – entered into an in-network agreement with United?

A. No.

Q. Do you know if Palladium ever entered into an in-network agreement with Palladium prior to 2009?

A. I don't know.

   Mr. Watt:  Objection; form.

Q. And so you have never seen any fee schedule that dictates the fees – the facility fees for procedures performed at Palladium; is that correct?

A. That is correct.

Ex. 3 at 74:12-13, 22-23, 25, 75:1-25.  Dr. Cohen's testimony is consistent with the testimony that the Court relied upon in its SJ Order to conclude that "there is evidence no such fee schedule exists":

> Palladium employee Brad Kovnat testified that 'there was no agreed to fee schedule with United,' that 'as an out-of-network provider, Palladium did not have a written agreement with United,' and that 'Palladium did not have a reimbursement schedule with United while [he was] employed with Palladium and Northstar. Palladium's 30(b)(6) witness, Donald Kramer, testified that he did not know to what 'fee schedule' ¶57 of the Fourth Amended Complaint (Dkt. 140) was referring.

Dkt. 541 at 24.

### D. Dr. Cohen's Knowledge of the Fraud/Kickback Scheme

The undisputed facts not only undermine each of Par and Euston's allegations, they also point to deliberate fraud on the part of those Shell Companies and their alter-ego owner, Dr. Cohen. By his own testimony, for example, Dr. Cohen acknowledged that his Shell Companies provided

no goods or services to justify the hundreds of thousands of dollars in facility fee payments he received for steering his patients to Palladium. *See, e.g.,* Ex. 3 at 93:1-20:

> A:    Par and Euston would provide, as I mentioned before, things like assistance in terms of precertification process, determining medical necessity, assistance with coding, assistance with appealing – if – if there was a – a – any appeal issues that needed to be addressed, those types of services.
> Q:    Would Par and Euston provide any employees to Palladium?
> A:    No.
> Q:    Would Par and Euston apply – provide any physical supplies used during a procedure?
> A:    No.
> Q:    Would Par and Euston pay for anything used in the offices of Palladium, such as paper? Pens? A printer?
> A:    No.
> Q:    Would Par or Euston pay for any utility bills that Palladium insured?
> A:    No.

Ex. 3 at 93:1-20. Indeed, Dr. Cohen admitted that it was *Palladium* that provided the facility services:

> Q:    And what services would Palladium provide?
> A:    Well, they would provide use of a – of an Ambulatory Surgery Center, staff, equipment, generally the – the services that a – that an Ambulatory Surgery Center provides, in – in – you know, in its role regarding out-patient surgery.

*Id.* at 51:20-25, 52:1. Par and Euston's tax returns similarly show no facility fee expenses or ASC operating assets. *See* Par and Euston tax returns, attached hereto as Exhibits 13 and 14, respectively. *These were, in the very worst sense of the word, "shell" entities.* They performed no services, took no financial risk, employed no personnel, and served no purpose whatsoever except to receive facility fees to which they were not entitled.

Nor can Dr. Cohen escape that those alter ego shell companies were active participants in an Exclusive Use Arrangement with Palladium that he knew violated Texas ASC licensure laws. First, Par and Euston's tax returns characterize and deduct the 50% unlawful fee split with Palladium as "lease" payments. *See* Cohen0019, Cohen0030, attached hereto as Exhibit 15. Such

an arrangement is so patently unlawful under Texas law that even Par and Euston's designated expert, attorney Ivan Wood, opined as much.  *See* Tex. Health & Safety Code § 243.003; *see also* Ivan Wood dep. at 150:2-151:3, attached hereto as Exhibit 16, (concluding that "you cannot lease an ambulatory surgery center").

Second, Dr. Cohen admitted that he reviewed Ivan Wood's opinion letter before entering into the EU Agreements, yet Par and Euston failed to meet even Wood's absurdly low standard for legality when it came to operating under an EU Agreement.  Ex. 3 at 129:25, 130:1-6.  Dr. Cohen also admitted, for example, that he did not perform a fair market value analysis of the 50% of the facility fees he received from the arrangement (a core requirement for legality in Wood's opinion), nor was he aware of Palladium performing any such analysis, much less receiving one. *Id.* at 3-6, 16-19. He also well understood that his compensation under the EU arrangement was inextricably linked to the volume of patients he brought to Palladium. Ex. 3 at 137:21-25 ("That makes sense to me, that the more -- the more cases -- since reimbursement was based on remuneration for the -- for-- on a case -- on a case-by-case basis, the more cases, the more revenue that would come into – to Par.").

Third, Dr. Cohen knew from his own experience that the EU Arrangement was unusual in so many ways that it raised unmistakable red flags of impropriety. He testified that he had an ownership interest in another ASC, for instance, but under that arrangement, he was appropriately paid a pro rata share of the profits, and not an unlawful, fixed percentage split of the collected facility fees.  *Id*. at 24:15-25, 25:1-3.  He testified that he was not aware of a single other ASC that operated under a financial arrangement similar to that of Palladium under the EU Agreement. *Id*. at 53:25, 54:1-3. And, he testified that he never paid for facility services when performing procedures at other ASCs. *Id*. at 141:14-20.

Even if Dr. Cohen did not know that only way to properly share in the revenue of ASC facility fees is from a pro rata ownership interest, such knowledge was imputed to him through his billing agent, Palladium and one of its owners and officers, Dr. Kramer. Indeed, Dr. Kramer's recently produced K-1s show that he received significant distributions from Palladium based upon his pro rata ownership interest in Palladium, as the General Partner of Palladium, and General and Limited Partner of the Donald Kramer Family, Ltd.

The foregoing testimony and documents demonstrate that—like all the other Doctor Owners and their respective shell companies—Par and Euston had knowledge of and were engaged in illegal activity; activity which this Court found "similar to billing fraud schemes in criminal cases." Dkt. 514 at 16. Accordingly, neither Par, Euston, Don of Pain, nor Drs. Cohen or Kramer should benefit from their unlawful conduct. Their claims should be dismissed.

## III.   **STATEMENT OF RELEVANT UNDISPUTED FACTS**

This Court is intimately familiar with all of the relevant facts as they relate to the individual doctor owners and their respective shell companies, as well as the operation and mechanics of the massive fraud/kickback scheme. Rather than repeat those facts here, and because they apply equally to Par and Euston as they do to the other shell companies whole complaint was dismissed by this Court, United incorporates herein Section II. Statement of Relevant Undisputed Facts from United's Consolidated Motion for Summary Judgment as to All of Plaintiffs' Causes of Action, Dkt. 485 at 3-27, attached hereto as Exhibit 17.

## IV.   **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 mandates entry of summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court should grant summary judgment if there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. *Id*. at 322-23. An issue is "material" if resolution of that issue could "affect the outcome of the action," and a dispute as to a material fact issue is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party on that fact. *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

The movant must make a *prima facie* showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322-23; *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). The movant may satisfy this burden by demonstrating to the Court that the non-movant lacks evidence on an essential element of its claim. *Celotex*, 477 U.S. at 322-23. Once the movant carries this burden, the burden then shifts to the non-movant to produce admissible evidence raising a genuine issue of material fact. *Id.* at 323-24. Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Servs., LLC*, 341 F. App'x 26, 28 (5th Cir. 2009); *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Salas v. Carpenter*, 980 F.2d 299, 311 (5th Cir. 1992); *see also Hugh Symons Grp, PLC v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir. 2002) ("Unsubstantiated assertions are not competent summary judgment evidence."). A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Salazar-Limon v. City of Houston,* 826 F.3d 272, 277 (5th Cir. 2016) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997).

Moreover, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be genuine and material." *Willis v. Roche Biomed. Lab*., 61 F.3d 313, 315 (5th Cir. 1995). A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. (citation omitted).

## V.    LEGAL ANALYSIS

### A.    United Is Entitled To Summary Judgment On The Negligent Misrepresentation Claim.

To prevail on their negligent misrepresentation count, Par and Euston must prove that (1) United made representations in the course of its business; (2) United supplied false information for the guidance of others in their business; (3) United did not exercise reasonable care or competence in obtaining or communicating the information; and (4) Par and Euston suffered pecuniary loss by justifiably relying on the representation. *Alexander v. Grand Prairie Ford, L.P.*, 2007 WL 1576260, at *6 (N.D. Tex. May 31, 2007); *see also Schwartz v. Gregg*, 2010 WL 2977479, at *3-7 (Tex. App.–Austin 2010) (affirming summary judgment because vague testimony of conversation represented no more than scintilla of evidence). Importantly, "'the misrepresentation at issue must be one of existing fact.'" *Fankhauser v. Fannie Mae*, 2011 WL 1630193, at *7 (E.D. Tex. Mar. 30, 2011) (quoting *BCY Water Supply Corp. v. Residential Invs.*, *Inc.*, 170 S.W.3d 596, 603 (Tex. App-Tyler 2005, pet. denied)). "'A promise to do or refrain from doing an act in the future is not actionable because it does not concern an existing fact.'" *Id.*

### 1.    There Is No Evidence Of Any Misrepresentations By United.

In their OP, Par and Euston allege the following purported misrepresentations:

- "United represented at least twice that the surgery was pre-approved and covered." Ex. 1 at 3.

- "Since the fees were within the pre-approval schedule and had twice been approved, Plaintiffs believed and had reason to believe that the fees billed to United would be covered." *Id.* at 3.

- "This dispute arose because United made independent promises to Plaintiffs which induced Plaintiffs to incur surgical and facility expenses." *Id.* at 4.

- "With respect to each surgery, United at least twice represented by means of a pre-approval that the surgical fees and facility fees would be covered prior to surgery: once by inquiry of the Plaintiffs and another by inquiry of Palladium." *Id.*

- "United agreed to pay Plaintiffs for discharging the insurer's contractual obligations.:" *Id.* at 5.
- "United promised to provide coverage and pay the fees associated with the use of the ASC by preapproving and confirming insurance coverage." *Id. at* 6.

Most of the foregoing are not actionable as negligent misrepresentations at all because they are not allegations of existing fact, but are alleged promises of future payment. *DAC Surgical Partners, P.A. v. United Healthcare Services, Inc*., 2011 WL 5006598, at *3 (S.D. Tex. Oct. 20, 2011) ("Plaintiffs may not, under Texas law, pursue a negligent misrepresentation claim based on promises to perform in the future."). Even if they were allegations of existing fact, however, and even though Par and Euston have had ample opportunity to provide evidence that United made any representations regarding payment, let alone actionable misrepresentations, they have not been able to do so.

The Court in *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Insurance Co.* provides guidance here. 2007 WL 320974 (S.D. Tex. Jan. 30, 2007) ("*AITS I*"). In that case, a court in the Southern District of Texas granted summary judgment for Aetna on a provider's negligent misrepresentation and promissory estoppel claims because the provider "[could not] point to any representation about [the insured's] coverage or benefits, made before it treated [the insured], that was contradicted by or different from the defendants' later coverage and benefit decisions." 2007 WL 320974, at *10. Moreover, "[t]he undisputed summary judgment evidence shows that there was no representation that every charge AITS billed would be paid, even if the charge was determined to be duplicative or excessive, and therefore not covered." *Id*.

a. No Promises Of Payment

Neither Par nor Euston could identify a single document or communication pertaining to any of the claims at issue where United made a representation guaranteeing or promising payment.

14

They also could not provide even the most basic foundational requirements to support their allegations, like a day, month or year when the communication took place, the individuals who were parties to the communications, or what they said to each other.  The reason for these glaring omissions is simple – no guarantees or promises were ever made.

To the extent Par and Euston testified that coverage verification calls had been made by Palladium as their "billing agent," Palladium concedes that verification of coverage is different than a promise of payment.

Documentary evidence, including communications from United to Dr. Cohen, Par, Euston, Palladium, and the patients, also confirms that United did not guarantee payment of the facility services, let alone payment to Par and Euston. For example, United's January 14, 2009 and February 24, 2009 letters expressly disavowed that the preauthorization process was a promise or guarantee of payment: "Please be aware that the information in this letter does ***not*** guarantee payment or represent a treatment decision." Exs. 10 and 11 (emphasis added). Moreover, Palladium's 30(b)(6) witness, Donald Kramer, testified that he had no knowledge of any representations by United that the claims at issue would be paid. Ex. 9 at 264:15-265:2; 265:23-266:2, 269:18-270:24, 271:20-272:2 (Palladium has no knowledge of United "ever representing that it would pay for any claims at issue in this case.); *see also* Ex. 18, Kovnat Tr. at 110:8-111:3; Ex. 19, Randall-Tillis Tr. at 71:17-21.

As in *AITS I*, there is no evidence that United made any guarantees of payment or representations of coverage beyond the terms of the plans. *See* 2007 WL 320974, at *10. Indeed, all the evidence is to the contrary. Because Par and Euston do not and cannot present any evidence that United promised or guaranteed payment on any claim, summary judgment should be granted for United on the negligent misrepresentation claim. *See Schwartz v. Gregg*, 2010 WL 2977479,

at \*3-7 (Tex. App.–Austin 2010) (affirming summary judgment because vague testimony of conversation represented no more than scintilla of evidence); *Fidelity Nat'l Title Ins. Co. v. Doubletree Partners, L.P.*, 2011 WL 4715174, at \*22 (E.D. Tex. Oct. 5, 2011) (entering summary judgment because nonmovant "g[ave] no *specific* misrepresentations made by [movant]") (emphasis added), *rev'd* on other grounds, 739 F.3d 848 (5th Cir. 2014).

    b.   No Fee Schedule Setting Forth Maximum Pre-Allowed Rates

    Similarly, there is no evidence that Par, Euston, or their billing agent Palladium ever had any fee schedule from United. August 30, 2012 Tr. at 54:7-14, attached hereto as Exhibit 20, (THE COURT: So you need to produce the fee schedules for facility fees for 2003 through 2009. MS. MCLAURIN: Yes. THE COURT: I want you to produce that. MS. MCLAURIN: If Palladium can locate them. THE COURT: All right. Well, I want them to locate them. MS. MCLAURIN: As do I."). Neither Dr. Cohen, his shell companies, nor Palladium has ever seen the purported fee schedule, has personal knowledge that it existed, or knows what it contains.

    The reason for this glaring omission is simple – no such fee schedule exists. Specifically, Palladium's Director of Business Development, Brad Kovnat, testified that "there was no agreed-to fee schedule with United" because Palladium was an out-of-network ASC. *See* Ex. 18, Kovnat Tr. at 113:9-10; *id.* at 171:13-172:1, 173:1-4 (as an out-of-network provider, Palladium had no contract or written agreement with United); *see also* Ex. 9, Palladium 30(b)(6) dep. at 273:24-274:19, 280:8-13, 281:3-24.

    Kovnat also testified that, based on his experience attending partnership meetings, it was his understanding that Palladium looked to several sources, including billing information from local ASCs and various other sources to develop and update the amounts it would charge for facility services. Ex. 18, Kovnat Tr. at 179:9-14.

2.   There Is No Evidence That Plaintiffs Relied On Any False Representations By United.

As set forth above, Plaintiffs have failed to provide evidence of any alleged misrepresentation. Without a misrepresentation, it follows that there can be no reliance. *See Lawfinders Assoc. Inc. v. Legal Research Ctr.*, 2002 WL 1940112, at *3 (5th Cir. 2002) (granting summary judgment on fraud claim where there no evidence of reliance); *Chitsey v. Nat'l Lloyd's Ins. Co.*, 698 S.W.2d 766, 769 (Tex. App.—Austin 1985) ("[W]hen one makes his own investigation of the facts, he cannot, as a matter of law, be said to have relied upon the misrepresentations of others."). Therefore, Par and Euston do not and cannot satisfy the reliance requirement of their negligent misrepresentation cause of action.

3.   There Is No Evidence Of Damages.

As a threshold matter, a plaintiff "must provide evidence that he suffered injury as the result of his reliance upon a promise or representation in order to support his fraud or misrepresentation claim." *Camp v. Ruffin*, 30 F.3d 37, 38 (5th Cir. 1994). Moreover, "the Texas Supreme Court has unequivocally held that 'the benefit of the bargain measure of damages is not available for a claim of negligent misrepresentation.'" *Eastern Exp., LP v. XTO Energy, Inc.*, 2012 WL 1059080, at *4 (Tex. App.–Fort Worth 2012) (quoting *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663 (Tex. 1998)); *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 302 (Tex. App.–Dallas 2009, no pet.) ("A plaintiff cannot recover benefit-of-the bargain damages for negligent misrepresentation; a plaintiff can only recover for out-of-pocket loss."). Thus, in *Eastern*, the appellate court held that "the trial court did not err by granting summary judgment on Appellants' negligent misrepresentation claim" where "Appellants [did] not identif[y] any expenses they incurred in alleged reliance on [defendant's] representations," but rather, "rel[ied] solely on a damage theory that would award them the amounts of money they would have received

had they signed mineral lease agreements with [defendant]," in accordance with terms initially offered. *Id*.

In this case, Par and Euston have failed to provide any evidence to support *any* alleged damages, let alone out-of-pocket losses. Indeed, a central facet of the scheme was that the doctors and their shell companies bore no financial risk in the EU arrangement. This is so because they did not provide the facility services at Palladium, nor did they incur any expenses in connection with the facility services provided to patients at Palladium. Moreover, it is undisputed that when the claims for which Par and Euston sought payment were denied, they owed nothing to Palladium. Ex. 3 at 117:16-24 (agreeing that "Par would only owe 50% of the *collected* revenues") (emphasis added). Thus, Par and Euston have not suffered any out-of-pocket damages as a result of United's decision to deny the claims.

In sum, Par and Euston do not and cannot offer any evidence to satisfy any element of their negligent misrepresentation claim. Thus, United is entitled to summary judgment.

### B. United Is Entitled To Summary Judgment On The Breach Implied-In-Fact Contract Claim.

To prove their breach of implied-in-fact contract claim under Texas law, to the extent it is not time-barred, Par and Euston must demonstrate: "(1) the existence of a valid contract; (2) performance or tender of performance; (3) breach by the defendant; and (4) damages resulting from the breach." *Oliphant Fin., LLC v. Patton*, 2010 WL 936688, at *3 (Tex. Ct. App Mar. 17, 2010). As set forth below, Par and Euston cannot establish any of these elements.

Plaintiffs acknowledge that, as out-of-network providers, neither Par nor Euston nor Palladium had an actual contract with United. And while "[e]xistence of a contract can be implied from parties' actions that indicate a mutual intent to be bound to their respective obligations," *Jordan v. Sony BMG Music Entm't, Inc.*, 637 F. Supp. 2d 442, 452 (S.D. Tex. 2008) (citing *R.R.*

*Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 222 (5th Cir. 2005)), "a meeting of the minds is an essential element of an implied-in-fact contract." *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc*., 246 S.W.3d 42, 49 (Tex. 2008)). "The court must look to the conduct of the parties to determine the terms of the contract on which the minds of the parties met." *Stewart Title Guar. Co. v. Mims*, 405 S.W.3d 319, 339 (Tex. App.– Dallas 2013). "The determination of a meeting of the minds is based on the objective standard of what the parties said and did, not on their subjective states of mind." *Id.* Moreover, even with an implied contract, "[t]he law is well settled that a contract, to be enforceable, must be sufficiently certain so as to enable the court to determine the respective legal obligations of the parties." *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 568-69 (Tex. App.–Dallas 1989) (affirming summary judgment for defendant on breach of implied contract claim). Par and Euston cannot establish an issue of fact as to whether United impliedly agreed **to pay Dr. Cohen's unlicensed Shell Companies** for facility services that they did not render.

As set forth above, there is no evidence that United even impliedly agreed to compensate Par and Euston for facility services that they did not provide, much less that there was a meeting of the minds as to the terms of the implied contract. Nor is there evidence that United agreed to pay Par and Euston pursuant to a "pre-approved schedule." Ex. 1 at 3. Thus, Par and Euston cannot establish an implied-in-fact contract, or even an issue of fact as to that matter.

Nor can Par and Euston offer any evidence that they performed under this purported implied contract, as they admit that Palladium performed the facility services giving rise to the facility fee bills. Thus, Par and Euston cannot provide any evidence to satisfy the second element of an implied-in-fact contract.

"[W]hen no contract exists, there can be no breach of the contract." *Valores Corp., S.A. de*

*C.V. v. McLane Co., Inc.*, 945 S.W.2d 160, 174 (Tex. App.–San Antonio 1997). Here, since Par

and Euston cannot establish an implied-in-fact contract to pay them for facility services or their

performance of facility services, it follows that they cannot establish a breach or damages. This

Court previously held, as a matter of law, that given the lack of evidence regarding the verification

calls between Palladium and United there was no implied contract between any of the shell

companies or Palladium, on the one hand, and United on the other hand.  Dkt. at 8. The same is

true with respect to Par and Euston.

### C.    United Is Entitled To Summary Judgment On The Insurance Code Claims.

The Court should grant United's Motion with respect to the Insurance Code claims because

Par and Euston lack standing to pursue claims under the Texas Insurance Code, and because there

is no evidence of any violations.

Par and Euston allege that they have suffered damages arising out of:

- "Making a statement misrepresenting the benefits of advantages promised by an insurance policy"
- "Making untrue, misleading, and/or deceptive representations regarding the business of insurance or a person in the conduct of the person's insurance business"
- "Making an untrue statement of material fact in the business of insurance"
- "Making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact"
- "Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"

Ex. 1 at 6.

Par and Euston, however, lack standing to bring claims under Chapter 541 because they

are neither named insureds nor third-party beneficiaries under the health insurance policies. *See*

*Parra v. Markel Int'l Ins. Co.*, 300 F. App'x 317, 319 (5th Cir. 2008) (affirming summary

judgment based on lack of standing); *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 150 (Tex. 1994).

20

United never issued an insurance policy to, nor entered into any contract with, Par and Euston. Indeed, Par and Euston expressly alleged that their causes of action "Are separate and distinct to from the insurer-insured contracts." Ex. 1 at 5.

At most, they are third-party claimants, but causes of action pursuant to Chapter 541 are unavailable to third-party claimants: "[A] third party claimant has no contract with the insurer or the insured, has not paid any premiums, has no legal relationship to the insurer or special relationship of trust with the insurer, and in short has no basis upon which to expect or demand the benefit of the extra-contractual obligations imposed on insurers under 21.21[, now §541,] with regard to their insureds." *Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 220-21 (Tex. App.– Houston [1st Dist.] 2004) (quoting *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 149 (Tex. 1994)); *see also Barrios v. Great Am. Assur. Co.*, 2011 WL 3608510, at *4-5 (S.D. Tex. Aug. 16, 2011); *Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927, 931 (Tex. App.–Dallas 2004) (affirming summary judgment based on lack of standing despite that plaintiff "sue[d] as an assignee of [the insured's] rights"). Moreover, Section 541.051(1) addresses misrepresentations regarding insurance policies, which Par and Euston disavowed in the OP. Ex. 1 at 5; *see* Tex. Ins. Code § 541.051(1) (requires "statement misrepresenting with respect to a policy . . . (A) the terms of the policy; (B) the benefits or advantages promised by the policy; or (C) the dividends or share of surplus to be received on the policy"). Given that Par and Euston have admitted that their causes of action have nothing to do with the patients' insurance policies, they have no standing with respect to section 541.051(1).

In addition, Par and Euston cannot point to any evidence that United violated §§ 541.051(1), 541.052, 541.061(1) or 541.061(3). All of these sections require misrepresentations or misleading statements. As set forth above, Par and Euston have no evidence of even one misrepresentation or misleading statement. In granting United's consolidated motion for summary

judgment, the Court found that "plaintiffs point to no evidence that there is a genuine issue of material fact that representations were made during the verification telephone calls, that an agreement conferring rights, remedies, or obligations was made. . . ." Dkt. 541 at 30. Par and Euston have added nothing to the evidentiary record to change that view.

### D.     United is Entitled to Summary Judgment on the Texas Business & Commerce Code

Par and Euston also allege damages arising out of United's purported violation of § 17.46(b)(12) of the Texas Business and Commerce Code (Texas Deceptive Trade Practices Act ("DTPA")). That section prohibits "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Ex. 1 at 5.

To begin, Par and Euston lack standing to proceed with this claim because they are not "consumers" under the DTPA. *See Cash Rent-A-Car, Inc. v. Old Am. Cty. Mut. Fire Ins. Co.*, 2010 WL 143482, at *8 (Tex. App.–Houston [1 Dist.] 2010) (affirming summary judgment for insurer on 17.46(b)(12) claim because plaintiff cannot "proceed on its DTPA claims without consumer status"). "Whether a plaintiff is a consumer under the DTPA is a question of law for the court to decide." *Cash*, 2010 WL 143482, at *7. In *Cash*, the plaintiff, a car rental agency, sought "to recover insurance proceeds based upon the allegation that [its customer] was an insured of [the defendant]." *Id*. However, as the court in *Cash* explained, "Texas law recognizes that a party whose only relation to an insurance policy is to seek policy proceeds is not a 'consumer'" and does not have standing under the DTPA. *Id*.

Likewise, an alleged medical provider whose "only relation to the United plans [is] to seek the proceeds of those plans . . . [does] not qualify as a 'consumer' under the Act." *Encompass Office Solutions, Inc. v. Ingenix, Inc.*, 775 F. Supp. 938, 960-61 (E.D. Tex. 2011). Par and Euston

have no relation to United except in seeking the proceeds of United health plans. They, therefore, do not qualify as consumers under the DTPA, and do not have standing to state a claim under 17.46(b)(12). *See id.* at 961. (to qualify as a consumer, "(1) the person must have sought or acquired goods or services by purchase or lease, and (2) the goods or services purchased or leased must form the basis of the complaint") (citing Tex. Bus. & Com. Code § 17.45(4)); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981)); *Cash*, 2010 WL 143482, at *8.

Even if Par and Euston did have standing, however, there is simply no evidence that United "represent[ed] that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Tex. Bus. & Com. Code § 17.46(b)(12). There is no evidence of any "agreement," the "rights" "remedies" or "obligations" it purportedly conferred or involved, or of any misrepresentation. Thus, summary judgment should be entered in United's favor. *See Crawford v. GuideOne Mut. Ins. Co.*, 420 F. Supp. 2d 584, 600 (N.D. Tex. 2006) (granting summary judgment for defendant insurer where "[p]laintiff failed to direct the Court to evidence to support the allegation that Defendant represented that the Policy involved rights, remedies, or obligations which it did not have or involve"); *Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 395 (Tex. App.– Dallas 2012) (summary judgment for insurer where plaintiff "adduced no evidence that First Specialty made any . . . false representations" in violation of 17.46(b)).

### E.   United Is Entitled To Summary Judgment On The *Quantum Meruit* Claim.

This Court previously explained that:

> To state a claim of quantum meruit, a plaintiff must allege facts supporting each of the following elements: (1) that the plaintiff rendered valuable services or furnished materials; (2) that the services rendered or materials furnished were undertaken for the person or entity sought to be charged; (3) and that the person or entity sought to be charged accepted and enjoyed the services or materials; (4) under such circumstances as reasonably notified the

> person or entity sought to be charged that the plaintiff, in performing
> the services or providing the materials, expected to be paid by the
> person or entity sought to be charged.

*See DAC Surgical*, 2011 WL 3841946, at *6. Par and Euston allege that they "provided a valuable service to United." Ex. 1 at 6. Par and Euston do not and cannot establish any facts supporting this cause of action. And, as the Court previously ruled on United's consolidated motion for summary judgment, "[these] claims fail because they seek disgorgement based on healthcare services provided to patients.  Plaintiffs cannot recover under these causes of action from United, because plaintiffs did not provide healthcare services to United." Dkt. 541 at 31.

Here, Par and Euston cannot establish that (1) they rendered valuable services or furnished materials, (2) they rendered any such services for United, or (3) United accepted the services or materials. Indeed, the undisputed evidence establishes that Par and Euston did not provide any services at all, whether for patients or for United.

Moreover, even assuming Par and Euston provided facility services for which they could lawfully collect reimbursement from United – which they did not – Par and Euston do not offer any evidence that these services "were undertaken for [United]," or that United "accepted and enjoyed the services or materials." *DAC*, 2011 WL 3841946, at *6.

At least seven courts, including this court and the Eastern District of Texas, have held that a medical provider cannot state a claim for quantum meruit against an insurer because medical services are provided for patients, not insurers. *See Mid-Town Surg. Ctr., LLP v. Blue Cross Blue Shield of Texas, Inc.,* 2012 WL 1252512, at *3 (S.D. Tex. Apr. 11, 2012) (dismissing quantum meruit claim where the patients were the direct beneficiaries of plaintiff's services, not the insurer); *Encompass*, 775 F. Supp. at 966 (E.D. Tex. 2011) ("Even if United received some benefit as a result of Encompass providing medical services to its insureds, a proposition the court finds dubious, Encompass's services were rendered to and for its patients, not United."); *Broad Street*

*Surgical Ctr., LLC v. UnitedHealthGroup, Inc.*, 2012 WL 762498, at *8 (D.N.J. Mar. 6, 2012) (quantum meruit claim would be futile because benefit conferred was on the patients, not United); *Adventist Health Sys./Sunbelt Inc. v. Medical Sav. Ins. Co.*, 2004 WL 6225293, at *5-6 (M.D. Fla. March 8, 2004) (dismissing quantum meruit and unjust enrichment claims brought by hospital against insurer because "as a matter of commonsense, the benefits of healthcare treatment flow to patients, not insurance companies"); *Joseph M. Still Burn Ctrs., Inc. v. Amfed Nat. Ins. Co.*, 702 F. Supp. 2d 1371, 1376-77 (S.D. Ga. 2010) (plaintiff medical provider performed services for patient, not insurer); *Cedars Sinai Med. Ctr. v. Mid-West Nat. Life Ins. Co.*, 118 F. Supp. 2d 1002, 1013 (C.D. Cal. 2000); *see also Travelers Indem. Co. of Conn. v. Losco Group, Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) (quantum meruit claim against insurer was futile because it "is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured-which hardly can be called a benefit.").

Finally, there is no evidence that United had been notified that Par and Euston – as opposed to Palladium, the licensed ASC – expected to be paid for the facility services. *See Fleming & Assocs. v. Miller & Assocs.*, 2005 WL 1155118, at *5 (S.D. Tex. 2005) (granting summary judgment for defendant on quantum meruit claim where "no evidence that Defendants were reasonably notified in any manner that Plaintiff expected to be paid fees for its legal services rendered"). Palladium is the licensed ASC, furnished the facility services, and was identified as the provider on the claims and in the EU Agreements. In contrast, there is no evidence that United knew that Par and Euston were seeking reimbursement in their own right for services that they purportedly provided. Indeed, ***Dr. Cohen and his agents concealed from United the role Par and Euston payed in the fraud/kickback scheme.*** *See* Ex. 21, Chalupsky 30(b)(6) Tr. at 446:16- 448:2

(Based on the claims files with United, United would have assumed Par and Euston were Palladium's billing agent) (emphasis added).

Thus, summary judgment should be entered against Par and Euston on this cause of action. *See Tarrant Dialysis Ctrs., Inc. v. Coresource, Inc.*, 2005 WL 1201021, at *5 (N.D. Tex. 2005) (granting insurer's motion for summary judgment where provider did "not come forward with any evidence to establish a fact issue as to each element of its claims for quantum meruit").

### F.   United Is Entitled To Summary Judgment On The Promissory Estoppel Claim.

To prevail on their promissory estoppel claim, the Shell Companies must prove: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 300 (5th Cir. 2010). To be enforceable, "the asserted 'promise' must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action." *Landmark Org., LP v. Tremco Inc.*, 2010 WL 2629863, at *7 (Tex. App.–Austin 2010).

Par and Euston allege that "United promised to provide coverage and pay the fees associated with the use of the ASC by pre-approving and confirming insurance coverage." Ex. 1 at 6. As set forth repeatedly above, there is no evidence that United promised anything, much less that it would pay Par and Euston for facility services they did not perform, were not licensed to perform, and concerning which Par and Euston deliberately concealed their involvement. Indeed, United even sent Par, Euston, Dr. Cohen, and Palladium letters, like the ones attached hereto as Ex. 11 and 12, expressly stating that a pre-certification is not a guarantee of payment. "Again, plaintiffs have failed to point out any evidence that United specifically promised to pay facility fees and that it would be reasonable to rely on such a promise."  Dkt. 541 at 31. Accordingly, summary judgment should be entered for United on the promissory estoppel claim.

## VI.    ARGUMENTS    FROM    CONSOLIDATED    MOTION    FOR    SUMMARY JUDGMENT

In its SJ Order, this Court declined to address the arguments below as moot. In an abundance of caution and to preserve the record, United includes these in the instant motion.

### A.    Par and Euston Lack Standing To Pursue Causes Of Action Against United For Payment Of Facility Fees.

#### 1.    Article III Standing

Par and Euston lack Article III standing to seek money from United for ASC facility services. "If a plaintiff lacks Article III standing, then a federal court lacks jurisdiction to hear the complaint." *Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004). At a minimum, the requirements of Article III standing demand that the plaintiff "establish an injury in fact," namely "an invasion of a legally protected interest which is . . . concrete and particularized." *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002); *see also Wendt v. 24Hour Fitness USA, Inc.,* 821 F.3d 547, 550 (5th Cir. 2016); *Willis v. Roche Biomed. Lab.*, 61 F.3d 313, 315 (5th Cir. 1995). "Merely asking for money does not establish an injury in fact." *Rivera,* 283 F.3d at 319 (plaintiff's claim that loss of cash was an economic injury did not demonstrate injury or causation). Rather, "plaintiffs must demonstrate an invasion of a ***legally protected interest***." *Id.* (citation omitted) (emphasis added).

In this lawsuit, Par and Euston are seeking facility fees for ASC services from United but cannot meet their burden to establish Article III standing for any of their alleged causes of action – breach of implied contract, negligent misrepresentation, promissory estoppel, violations of the Texas Insurance Code, or quantum meruit. First, Par and Euston have not suffered an injury-in-fact because they: (1) provided no facility services, (2) furnished no materials related to facility services, and (3) incurred no out-of-pocket expenses related to facility services. Second, Par and Euston could not have suffered an injury to a *legally cognizable* interest because they are seeking

27

fees for services they were legally prohibited from providing as unlicensed providers of facility services. Finally, Par and Euston lack standing to seek compensation under the insurance contracts between United and its insureds – which they have claimed throughout this case they are not doing – because the Shell Companies are not assignees of the insureds' benefits.

a.   Shell Companies Suffered No Injury-In-Fact

A plaintiff cannot establish standing merely by alleging causes of action that are recognized under state or federal law. Rather, plaintiffs must satisfy "[t]he 'injury in fact' test[, which] requires *more than* an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.'" *Rivera*, 283 F.3d at 320 (5th Cir. 2002) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734-35 (1972)); *see also Ryan v. Brookdale Int'l Sys., Inc*., 230 F. App'x 366, 368 (5th Cir. 2007).

Because Par and Euston raise state law claims, the Fifth Circuit has instructed that "Texas substantive law" governs whether they have standing to sue under those laws. *See Kona Tech. Corp. v. Southern Pacific Transp. Co.,* 225 F.3d 595, 602 (5th Cir. 2000). Notably, a plaintiff has suffered no injury-in-fact (and thus lacks standing) unless it rendered a service, furnished materials, or suffered out-of-pocket expenses. *See PKF Business Sys., Inc. v. www. Zipworld.com, Inc.*, 2002 WL 1285574, at *4 (N.D. Tex. June 6, 2002) (quantum meruit only allows recovery for a plaintiff who "has rendered a valuable service or furnished materials"); *Busch v. Basic Organics, Inc.,* 2007 WL 603385, at *6 (N.D. Tex. 2007) (plaintiff asserting unjust enrichment must have provided a benefit to the defendant); *Frost Crushed Stone Co., Inc. v. Odell Geer Const. Co., Inc.,* 110 S.W.3d 41, 44 (Tex. App.–Waco 2002) (promissory estoppel is only available to plaintiffs who acted in detrimental reliance); *see also Bykov v. Radisson Hotels Int'l, Inc.,* 221 F. App'x 490, 492 (8th Cir. 2007) (plaintiff lacked standing to sue hotel for unjust enrichment because plaintiff's employer, not plaintiff, "paid the hotel bill and suffered the alleged injury"); *Banet v. Fonds de*

*Reg. et de Controle Cafe Cacao,* 2010 WL 1066993, at *6 (Del. Ch. 2010) (plaintiffs lacked standing to assert unjust enrichment and quantum meruit claims because "[o]nly the provider has standing to bring an equitable claim for recovery").

Here, the undisputed evidence shows that Par and Euston suffered no out-of-pocket damages based on United's denial of the facility fee claims because they have not provided any facility services, were not licensed to provide facility services, have not furnished any materials associated with facility services, and have not incurred any out-of-pocket expenses related to facility services. The undisputed evidence also establishes that Palladium – not Par and Euston – was the licensed ASC that provided the services for which Par and Euston seek payment. Indeed, Par and Euston cannot point to a single syringe, surgical glove, bed sheet, medication or piece of equipment, or other expense typically included in a facility bill that ***they paid for*** in conjunction with any of the surgical procedures performed on a patient at Palladium. Rather, Palladium incurred the full cost of providing the facility services. Perhaps the most compelling evidence of this undisputed fact is that Par and Euston never paid Palladium anything for the "use" of Palladium's facility when insurance companies denied payment. Thus, Palladium is the only entity that could even theoretically assert damages resulting from United's nonpayment of the claims at issue in this lawsuit. Palladium, however, has released United from liability on all the claims at issue in this case. *See* Ex. 22, Confidential Settlement Agreement.

The undisputed facts show, and Par and Euston admit, that they are not facilities, much less licensed facilities. Ex. 3 at 182:1-6 (Dr. Cohen admitting that Par and Euston are not licensed ASCs.).

Additionally, although they are seeking payment for facility services, Par and Euston admit that they did not provide these services – Palladium did. Ex. 3 at 93:1-20; *see also* Ex. 9, Palladium

30(b)(6) Tr. at 345:23-346:6 (Palladium is entitled to payment from Shell Companies if they prevail in this lawsuit because Palladium "provided the services"); 472:9-474:7 ("I think facility services were provided by Palladium."); Ex. 9, Palladium 30(b)(6) Tr. at 239:22-240:15 ("the facility owner . . . provided the facility services. That would have been Palladium"), 242:23-243:1 (no entity other than Palladium provided facility services); Kovnat Tr. at 84:25-86:22 ("Palladium supplied the staffing, the facility itself. . . supplies, whatever was needed for the procedures, scheduling, precertification, many items to – you know, just the overall care and maintenance of the facility").

Consistent with these admissions, the undisputed evidence also establishes that Palladium was the entity that actually incurred expenses associated with the provision of facility services to patients. As a preliminary matter, the terms of the Use Agreements provide that Palladium: (1) "shall retain ultimate control and direction over the ASC's operation." Exs. 5 and 6 ¶ 2; (2) "shall be responsible for all operational and maintenance expenses of the ASC and . . . shall indemnify and hold [the Shell Companies] harmless from any and all liabilities, costs and expenses relating to or arising out of the operation of the ASC," *Id*. ¶ 5; (3) "shall, at its own expense, maintain the ASC and all equipment therein in good repair and condition," *Id*. ¶ 10; and (4) "shall provide all utility and support services . . . and pay for any costs or charges therefore," *Id*. ¶ 11. Moreover, Dr. Cohen admitted that Palladium incurred the expenses of providing facility services. Ex. 3 at 51:22-25, 52:1.

As set forth above, the personal and corporate tax returns produced by Par, Euston, and Cohen corroborate that Par and Euston provided no services, because in the tax returns, they reported that Par and Euston had *de minimis* expenses, if any, no meaningful operating assets, and

no employees.[2] *See* Exs. 13 and 14 and Ex. 3 at 80:22-25, 81:1-2 (Cohen admitted that Par and Euston have no employees other than himself).

Third, consistent with Par and Euston's testimony that Palladium provided the facility services, the vast majority of the claims that were submitted to United identified Palladium as the provider seeking reimbursement. Ex. 3 at 147:7-25, 148:1-150:23. Similarly, Beverly Randall-Tillis, Palladium's Business Office Manager and Plaintiffs' designated expert on billing, also admitted that using Palladium's name in Box 1 on the form was a representation that Palladium was the provider. Ex. 19, Randall-Tillis Tr. at 150:24-152:25 (CMS is an authority as to how a claim form should be coded and her current employee billers regularly consult CMS for guidance as to how to bill); 155:8-156:20 (United and other insurers follow CMS guidelines); 156:22-157:12, 158:12-159:19 (CMS manual instructs that Box 1 should list the Provider Name); 161:18-24 (per CMS instructions, listing Palladium in Box 1 was a representation that Palladium was the provider).

In short, the undisputed evidence shows that Par and Euston have not provided the facility services, were not licensed to provide the services, have furnished no materials associated with the

---

[2]     Federal courts consistently treat statements in tax returns as admissions by the taxpayer. *See Waring v. Comm'r*, 412 F.2d 800, 801 (3d Cir. 1969), *aff'g* T.C. Memo. 1968-126; *Crigler*, T.C. Memo. 2003-93, at *5-6; *Kaltreider v. Comm'r*, 28 T.C. 121, 125-26 (1957), *aff'd* 255 F.2d 833, 839 (3d Cir. 1958) ("It is settled that statements of this nature (self-description of business or occupation) constitute evidence of taxpayers' business."); *see also Mendes v. Comm'r*, 121 T.C. 308, 312 (2003); *Garner v. United States*, 424 U.S. 648, 649-50 (1976) (allowing prosecution based on admissions and incriminating disclosures in income tax returns). A filer "cannot now disavow those returns [prepared by or at the direction of him] without cogent proof that they are incorrect." *Crigler*, T.C. Memo 2003-93, at *5.
        Indeed, the Fifth Circuit and other courts have examined tax returns in analogous situations, and held that the taxpayers' characterization of themselves or payments in their tax returns could be used as material evidence in later lawsuits. *See, e.g.*, *Mack v. Talasek*, 2012 WL 1067398, at *3, *7 9 (S.D. Tex. 2012) (relying on plaintiffs' characterizations of themselves in their tax returns); *Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 450 (S.D.N.Y. 2002) (same); *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 982 (4th Cir. 1983) (noting that parties treated plaintiff as "an independent contractor for tax purposes"); *Mednick v. Albert Enterpr., Inc.*, 508 F.2d 297, 299 (5th Cir. 1975) ("pertinent facts" considered by the court included that plaintiffs' "tax returns were filed on the form for self-employed taxpayers"); *Real v. Driscoll Strawberry Assoc., Inc.*, 603 F.2d 748, 750 n.2 (9th Cir. 1979) ("Prior to the filing of this lawsuit, the appellants apparently assumed themselves to be independent contractors, as they have consistently claimed self-employed status on income tax returns.").

facility services, and have incurred no out-of-pocket expenses related to the facility services. This is fatal to the OP because it demonstrates that Par and Euston have suffered no injury-in-fact and thus, lack standing to pursue their causes of action.

          b.  Shell Companies Cannot Assert A Legally Protected Interest.

Even if Par and Euston had provided the facility services, they do not have standing to seek facility fees because Texas law prohibits them from providing facility services. To establish standing, it is not enough for plaintiffs to assert that they have suffered an injury. Instead, plaintiffs must assert an injury to a *legally cognizable* interest. *See Bell v. Am. Traffic Solutions, Inc.,* 371 F. App'x 488, 490 (5th Cir. 2010); *Heard v. Godwin*, 2009 WL 960187, at *3 (S.D. Tex. 2009). Notably, an "interest in evading the law cannot create standing" because that interest is not legally protected. *Bell,* 371 F. App'x at 490.

To the extent that Par and Euston now contend that they seek money for facility services that they provided – a contention that is belied by the undisputed evidence – they are impermissibly seeking compensation for services they were not lawfully permitted to render under Texas law. Texas black-letter law provides that: (1) an ASC cannot operate without a license, (2) each ASC must be separately licensed, and (3) an ASC license is not transferable or assignable. *See* Tex. Health & Safety Code § 243.003. Even Palladium's attorney, Ivan Wood, admits that this is the law in Texas and Palladium shared Wood's legal opinions with Dr. Cohen ***before*** he entered into their EU Agreements with Palladium. *See* Ex. 16 at 129:25, 130:1-6.

These licensing provisions are essential to protect public safety and welfare. *See* 25 T.A.C. § 135.1 (describing "Scope and Purpose" of the Texas ASC Licensing Act, including to "provide minimum standards for ambulatory surgical center licenses," and to ensure standards for "the construction and design, the qualifications of the professional staff and other personnel, the equipment essential to the health and welfare of the patients [and] sanitary and hygienic

conditions"); *Health Enrich. & Longevity Ins., Inc. v. State*, 2004 WL 1572935, at *7 (Tex. App. –Austin 2004) (discussing civil penalties for operating facility without a license in violation of Texas Health and Safety Code); *Dept. of Prot. & Reg. Svs. v. Schutz*, 101 S.W.3d 512, 519 (Tex. App.–Houston [1st Dist.] 2002) (purpose of licensure laws is to "protect the health, safety, and well-being" of public).

Here, Par and Euston do not and cannot claim that they have ever been licensed to operate an ASC. Nor do they dispute that they could not legally have used or leased Palladium's license. To the contrary, even Ivan Wood testified that the shell companies cannot "lease" Palladium's facility because to do so would require Palladium to cede control of the facility and thus its license. Yet, Par and Euston are seeking money for facility services that they could not render without a license. Thus, to the extent that Par and Euston contend that they provided the facility services for which they now seek compensation, they are seeking money for services they provided in violation of the law, and therefore should not be compensated.

In short, Par and Euston "'do not have a legally protected right to engage in illegal conduct and be free from the consequences of that activity.'" *Verrando v. ACS State & Loc. Solutions, Inc.,* 2009 WL 2958370, at *3 (N.D. Tex. Sept. 15, 2009).

**B.     The Shell Companies' Causes Of Action Are Barred By Applicable Statutes Of Limitations.**

"A defendant moving for summary judgment on the affirmative defense of limitations must conclusively prove when the cause of action accrued." *Ambulatory Infusion Therapy Specialist, Inc. v. N. Am. Adm'rs, Inc*., 262 S.W.3d 107, 119 (Tex. App.–Houston [1st Dist.] 2008) ("*AITS II*"). "'A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy.'" *Id.* (quoting *Johnson v. Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998)). "With regard to

a claim for medical benefits, "Texas law is clear . . . that limitations is not triggered when the last collection effort has been exhausted, but rather when the defendant denies a claim that it had allegedly promised to pay." *AITS I*, 2007 WL 320974, at *7.

Both *AITS I* and *AITS II* are instructive in this case. In *AITS I*, the provider alleged that Aetna verified a single patient's coverage in one telephone call on October 9, 2000, and the patient subsequently treated several times with the provider. *AITS I*, 2007 WL 320974, at *6-7. From December 8, 2000 to September 11, 2001, Aetna denied the provider's claims. *Id*. at *6. On October 14, 2005, the provider brought negligent misrepresentation and promissory estoppel claims against the insurer based on alleged misrepresentations made in the coverage call held on October 9, 2005. *Id*. The court held that these claims were barred by the two and four-year statutes of limitations, respectively. *Id*. at *7. In doing so, the court explained that the provider "knew by December 2000 that the defendants were not paying the 'full-billed charges' on every claim." *Id*. at *6. The court also rejected the argument that for the promissory estoppel claim, "limitations did not begin to run until AITS received a 'final denial of payment,' that is, when AITS decided not to pursue further collection efforts on the unpaid claim amounts." *Id*. at *6.

Similarly, in *AITS II*, the court held that the same provider's breach of contract and promissory estoppel claims against an insurer – which were also filed in October 2005 – were time-barred because the statute of limitations commenced on June 26, 2001, when the medical provider received an explanation of benefits letter stating that the insurer was paying only $3,500 of plaintiff's $31,089.20 invoice. *AITS II*, 262 S.W.3d at 119. As the court explained, "[u]pon receipt of the June 26, 2001 letter, AITS had knowledge of an injury—the denial of benefits in the amount of $27,589.20—and, therefore, had sufficient facts to seek a judicial remedy." *Id*. (citing *Thompson v. Great Am. Life Ins. Co.,* 2005 WL 1072706, at *3 (W.D. Tex. May 5, 2005) (because

"a decision to deny coverage had already been made and communicated to Plaintiff . . . Plaintiff possessed sufficient information to allow him to go to court to seek a judicial remedy, and his cause of action accrued on that date.").

In this case Par and Euston's causes of action have either a two or four year limitations period:

| Cause of Action | Statute of Limitations | Authority |
|---|---|---|
| Negligent Misrepresentation | Two Years | Tex. Civ. Prac. & Rem. Code § 16.003(a); *Milestone Props., Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 118-19 (Tex. Ct. App. 1993); *Alexander*, 2007 WL 1576260, at *5. |
| Chapter 541 Insurance Code | Two Years | Tex. Ins. Code § 541.162(a) |
| Breach of Implied Contract | Two Years | *Balawajder v. Johnson*, 2004 WL 51263, at *4-6 (Tex. App.–Houston [14 Dist.] 2004) (granting summary judgment where two-year statute of limitations ran on breach of implied contract claim); *W. Square Inv., Inc. v. W. Nat. Bank of Amarillo, Tex.*, 1998 WL 102569, at *3 (Tex. App.–- Amarillo 1998) ("Actions on implied contracts . . . are governed by the two-year limitation period . . . .") |
| Unjust Enrichment/Implied-In-Law Contract | Two Years | *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001) |
| Promissory Estoppel | Four Years | Tex. Civ. Prac. & Rem. Code Ann.§ 16.051 (Vernon 1997); *Prestige Ford Garland Ltd. Partnership v. Morales*, 336 S.W.3d 833, 837 (Tex. App.–Dallas 2011) |
| Quantum Meruit | Four Years | *Quigley v. Bennett*, 256 S.W.3d 356, 361 (Tex. App.–San Antonio 2008) |

Par and Euston filed their lawsuit on December 17, 2012. Ex. 1. All of their causes of action with two-year statutes of limitations are time-barred because Par and Euston, either directly or

through their billing agent – Palladium – received notice of United's position regarding coverage before December 17, 2010.[3]

First, on October 29, 2008, United put Palladium on notice that it would not pay facility fees to unlicensed shell companies when it sent two letters to Lake Breeze Surgical Affiliates at Palladium's address, 4120 Southwest Freeway regarding "Ambulatory Surgical Center License." *See* Ex. 23, 10/29/08 Letters.[4] In the letters, United advised that: (1) Texas Health & Safety Code § 243.003 requires ASCs to be licensed; (2) Lake Breeze was not licensed; (3) future claims for facility charges would not be paid until Lake Breeze provided an ASC license; and (4) "unless you are licensed as a hospital, skilled nursing facility, home health provider, government-qualified clinic, ESRD Clinic, FQHC Clinic, OPT Clinic, CORF Clinic, or CMHC Clinic, non-hospital hospice or ambulatory surgery center, etc., *UnitedHealth Group will not pay for facility charges*." *Id*. (emphasis added). These letters were stamped "Received Nov 8, 2008." *Id*. Moreover, as set forth above, the evidence conclusively establishes that, as of December 5, 2008, Palladium – the billing agent for Par and Euston – had received the letters from United, knew that, at a minimum, there was no guarantee that EU facility fee claims submitted to United would be paid, and was carefully tracking the decline in EU claims that United had paid. *See* Ex. 24, 12/5/08 Memo from

---

[3]     Pursuant to the Billing Services Agreements, Par and Euston appointed Palladium as their "sole and exclusive agent for the billing and collection of technical surgery fees," with the "responsibility and commensurate authority to provide full billing and collection services . . . in any reasonable manner [Palladium], at its sole direction, deems appropriate." Ex. 5 and 6 ¶¶ 1.1, 1.2. Moreover, in connection with the "billing and collection services" that Palladium was to provide, Par and Euston "grant[ed] a special power of attorney to and appoint[ed] Palladium as [Par and Euston's] true and lawful agent and attorney-in-fact." *Id*. ¶ 2.3. Thus, any knowledge that Palladium had regarding potential causes of action against United is imputed to Par and Euston. *See Scionti v. First Trust Corp.,* 1999 WL 35134588, at *32 (S.D. Tex. 1999) ("[T]he rule that knowledge of an agent is imputed to the principal applies to the limitations issue."); *Dean v. Frank W. Neal & Assoc., Inc*., 166 S.W. 3d 352, 357 (Tex. App.—Fort Worth [2d Dist.] 2005) (statute of limitations for home buyers' claims against builder began to run, when architect, their agent for building purposes, learned of movement in the foundation).

[4]     On November 17, 2008, United sent identical letters to Berlin Medical Services ("Berlin"), owned by podiatrist Anthony J. LaMarra, at Palladium's address, 4120 Southwest Freeway regarding "Ambulatory Surgical Center License." *See* Ex. 27, 11/17/08 Letters. Palladium received these letters, purportedly on behalf of Berlin, and provided them to its attorneys at Brown McCarroll, who produced them to United in this litigation.

K. Klein. Palladium's knowledge is imputed to Par and Euston. *See Scionti v. First Trust Corp.*, 1999 WL 35134588, at \*32 (S.D. Tex. 1999) ("[T]he rule that knowledge of an agent is imputed to the principal applies to the limitations issue."); *Dean v. Frank W. Neal & Assoc., Inc*., 166 S.W. 3d 352, 357 (Tex. App.–Fort Worth [2d Dist.] 2005) (statute of limitations for home buyers' claims against builder began to run, when architect, their agent for building purposes, learned of movement in the foundation.

Second, on March 3, 2009, United again put Palladium on notice that it would not pay facility fees to unlicensed Shell Companies. *See* Ex. 25, 3/3/09 Letter from Ingenix to Sprint Foot & Ankle at Palladium's address (advising that "any future claims you submit for facility charges will not be paid until you provide a copy of your Texas license to operate as an ambulatory surgical center").

Third, on March 17, 2009, representatives and attorneys for United and Palladium met in-person in Minnesota. *See* Ex. 26, Wicklund Decl. ¶ 3. At the meeting, representatives of Palladium, including Northstar's CEO Steve Linehan and CFO Kenny Klein, indicated that they requested the meeting with United because Palladium wanted United to pay all unpaid bills for facility services rendered at Palladium, including bills for services that were performed and billed under EU arrangements. *Id*. ¶ 4. At that meeting, United's attorney, Charles Chejfec, informed Palladium's officers and attorneys that United would not pay facility claims for procedures performed Palladium which were performed and/or billed under EU arrangements. *Id*. ¶ 5. United then presented a proposed business solution to Palladium regarding EU arrangement bills, the components of which were: (1) payment to United to repay amounts that United paid for EU bills; (2) Palladium walks away from pending EU bills; and (3) general mutual releases. *Id*. ¶ 6. Further, if Palladium agreed to (1), (2), and (3), then United would agree to the following additional

components: (4) negotiation of an in-network contract with Palladium with a fee schedule for facility goods and services; (5) Palladium would only use its own TIN to bill for facility fees; and (6) only Palladium could collect and retain facility fees. *Id*. In response to United's presentation, Palladium representatives indicated that Palladium: (1) would stop using the EU model; (2) was willing to negotiate an in-network contract with United and would submit bills only under the TIN associated with the licensed facility; and (3) did not have sufficient funds to repay the EU claims, but would consider accepting lower in-network rates in exchange for not making any repayments to United; and (4) would enter into general mutual releases. *Id*. ¶ 7.

Given these undisputed facts, Par and Euston knew United's position by November 8, 2008. To the extent there was any doubt, however, at the latest by March 17, 2009, when United's lawyer told Palladium in Minneapolis that it would not pay any EU claims, Palladium had full knowledge that United would not pay any EU claims. Accordingly, to the extent Par and Euston's limitations period had not started to run earlier on a claim-by-claim basis, it began to run on March 17, 2009.

Par and Euston did not file their lawsuit until December 17, 2012 – more than three years after United and Palladium met in Minneapolis. Thus, Par and Euston's causes of action for negligent misrepresentation, violations of Chapter 541 of the Texas Insurance Code, breach of implied or oral contract, and breach of implied-in-law contract/unjust enrichment, are time-barred. Moreover, Par and Euston, through Palladium, were on notice as early as November 8, 2008, when Palladium "Received" the Lake Breeze denial letters, that United would not pay EU claims. Because Par and Euston did not file their lawsuit until December 17, 2012, more than four years after the Lake Breeze letters, all of Par and Euston's claims are time-barred.

## VII.   <u>**CONCLUSION**</u>

For all the foregoing reasons, United Healthcare Services, Inc. and Ingenix, Inc. respectfully requests that the Court grant summary judgment against Par and Euston on all these claims.

Dated:  June 1, 2018                    Respectfully submitted,

                                        By:  /s/ Charles Chejfec

                                        Charles Chejfec (attorney-in-charge)
                                        Andrea Halverson
                                        Jeffrey Hansen
                                        ACTUATE LAW LLC
                                        901 West Jackson, Suite 204
                                        Chicago, Illinois 60607
                                        (312) 579-3108
                                        charles.chejfec@actuatelaw.com
                                        andrea.halverson@actuatelaw.com
                                        jeff.hansen@actuatelaw.com


                                        Kevin W. Yankowsky (of counsel)
                                        Texas State Bar No. 00791967
                                        Federal ID No. 18179
                                        Layne E. Kruse
                                        Texas State Bar No. 11742550
                                        Federal ID No. 2328
                                        FULBRIGHT & JAWORSKI LLP
                                        Fulbright Tower
                                        1301 McKinney, Suite 5100
                                        Houston, Texas 77010
                                        (713) 651-5198
                                        (713) 651-5246 (facsimile)
                                        kyankowsky@fulbright.com
                                        lkruse@fulbright.com

                                        ATTORNEYS FOR COUNTER-PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on June 1, 2018, I electronically filed the foregoing document with the Clerk of the Court through the CM/ECF system; counsel who are registered CM/ECF users will be served by the CM/ECF system.

<div style="margin-left: 50%;">

/s/ Charles Chejfec      
Attorney for Counter-Plaintiff

</div>